# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3110

_____

Trinity Cross; Molly Dupre; Arthur       *
Friederichs;[1] Daniel Green; Mary       *
Hastings; Joseph Locey; Kelly Meister;   *
Alistair Neill Stewart; Celeste Verheist, *
                                         *   Appeal from the United States
    Plaintiffs - Appellees,          *   District Court for the
                                         *   Eastern District of Missouri.
    v.                               *
                                         *
Joseph J. Mokwa, Police Chief, et al.,   *
                                         *
    Defendants - Appellants,         *

_____

Submitted: May 12, 2008
Filed: November 14, 2008

_____

Before LOKEN, Chief Judge, BYE and COLLOTON, Circuit Judges.

_____

LOKEN, Chief Judge.

The World Agricultural Forum (WAF) planned a conference in St. Louis in late May 2003. The St. Louis Police Department learned that prior WAF conferences in Boston, Washington, and other cities had attracted violent protests instigated by small anarchist groups that infiltrated peaceful protesters, and that Internet sites were

_____

[1]Though his attorneys spelled his name "Friedrich" in appellate pleadings, their client spelled his own name "Friederichs" at his deposition. We will spell the name as Friederichs himself spells it.

exhorting out-of-town activists to travel to St. Louis to participate in a counter-conference called "Biodevastation 7." The Federal Bureau of Investigation briefed the police on the history of these violent demonstrations, the tactics violent protesters used in the past, and the likelihood that potentially violent out-of-town protesters would stay illegally in unoccupied or condemned buildings. In response, the City adopted a "Building Code Violation Enforcement Plan" to identify vacant and condemned buildings and to prevent their unlawful occupation.

On the morning of May 16, 2003, St. Louis Building Inspector John MacEnulty and several St. Louis police officers went to 3309 Illinois Avenue, a condemned building, and then to 3022 Cherokee Street, a building identified by MacEnulty as lacking an occupancy permit. At 3309 Illinois, MacEnulty and the police forcibly entered, arrested five persons for occupying a condemned building, and searched the premises. The five were jailed for twenty hours, entered *Alford* pleas to those charges, and were placed on probation. At 3022 Cherokee, the police seized and allegedly damaged personal property of owner Arthur Friederichs but did not issue citations. These actions, and other police actions not at issue on this appeal, prompted twenty-five protesters to sue the City and its Mayor, the Board of Police Commissioners, the Building and Zoning Commission, Inspector MacEnulty, the Police Chief, and several police officers. Plaintiffs asserted a variety of federal claims under 42 U.S.C. § 1983 and pendent state law claims. The Police Chief and six officers appeal interlocutory orders denying them qualified immunity from the First Amendment and Fourth Amendment damage claims of seven plaintiffs arising out of the entries, seizures, and arrests at 3309 Illinois and the alleged damage to Friederichs's personal property at 3022 Cherokee. Other claims remain pending in the district court, and still other claims have been dismissed.

Qualified immunity protects government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v.

-2-

Fitzgerald, 457 U.S. 800, 818 & n.30 (1982). Reviewing the denial of qualified immunity *de novo*, we reverse in part. See Moore ex rel. Moore v. Briggs, 381 F.3d 771, 772 (8th Cir. 2004) (standard of review).

## I. Claims Relating to the Events at 3309 Illinois

The house at 3309 Illinois was condemned as unsafe for occupancy in 1999. Owner Daniel Green appealed. The Board of Building Appeals granted Green sixty days to obtain permits and correct deficiencies, which he failed to do. In 2001, Green requested an additional hearing. The Board again delayed demolition to give him time to obtain construction drawings and permits. In August 2002, the City notified Green that the building remained condemned and that any occupants were subject to arrest.[2] Before Inspector MacEnulty inspected 3309 Illinois on May 16, 2003, he reviewed computer records that listed the property as condemned and had a "Condemned Building Order" prepared and on hand.

On the morning of May 16, plaintiffs Molly Dupre and Kelly Meister were living at 3309 Illinois with Green's permission, and Trinity Cross, Joseph Locey, and Celeste Verhelst were there as Green's overnight guests. Green, who had moved next door, was not present but was keeping personal items at the house. Inspector MacEnulty approached with several police officers and informed those inside that the building was illegally occupied and must be vacated. An occupant replied, with a vulgar epithet, "We are not opening the door." The police forced open the door, removed and arrested the occupants, and searched the building, seizing a slingshot,

---

[2]The letter from another building inspector advised Green as property owner that an earlier Certificate of Inspection was revoked and that "the above-mentioned premise/unit is illegally occupied and subject to Condemnation for Occupancy; additionally, if said premise/unit, remains occupied, occupants may be subject to arrest and/or legal proceedings."

a sign saying "Kill Police," a bottle with a rag protruding, PVC pipes, a gasoline container, and two cans of flammable camper stove fuel.

## A. Entry, Search, and Arrest Claims

The five occupants asserted Fourth Amendment claims of unlawful arrest. The five and Green asserted claims of unlawful entry, search, and seizure. Inspector MacEnulty and the police officers filed separate motions for summary judgment, arguing they are entitled to qualified immunity from these damage claims. Plaintiffs responded that they had a reasonable expectation of privacy in the premises, the warrantless entry and search violated their clearly established Fourth Amendment rights, and the arrests were unlawful. The district court dismissed all claims against Inspector MacEnulty, concluding that his "enforcement of a standing condemnation order based on probable cause is not violative of the Fourth Amendment, even if scheduled to benefit an ongoing police investigation." Plaintiffs did not cross appeal this ruling; indeed, they did not include the summary judgment memoranda relating to MacEnulty in the record on appeal. As this ruling is critical to our analysis of the Fourth Amendment claims against the police officers, it is now law of the case.[3]

The district court granted the police officers qualified immunity from the claims of unlawful arrest because the officers had probable cause to believe that the five persons inside 3309 Illinois were illegally occupying a condemned building. Again, plaintiffs did not cross appeal that ruling, which was clearly correct.[4] However, the

[3]Given the nature of a condemnation order -- a determination that an unsafe structure must be unoccupied until it is repaired or demolished -- and the appeal process available to and exercised by owner Green to challenge that determination, we have little doubt the court's ruling was correct. See Hroch v. City of Omaha, 4 F.3d 693, 696-97 (8th Cir. 1993).

[4]A person who is "wrongfully on the premises" may not object to the legality of a search. Rakas v. Illinois, 439 U.S. 128, 141 & n.9 (1978). Likewise, a person

court denied the officers qualified immunity on the Fourth Amendment claims of unlawful entry, search, and seizure of property at 3309 Illinois on the ground that, unlike Inspector MacEnulty, their primary purpose was to search for evidence of crime, and no exigent circumstances such as severe disrepair justified entry without a search warrant. We disagree for two independent reasons.

First, the district court ruled that the condemnation order gave Inspector MacEnulty authority to enter 3309 Illinois without a warrant, a ruling plaintiffs do not challenge on appeal. If MacEnulty may enter without a warrant, he may also be accompanied by police officers, even officers who are also pursuing a criminal investigation, like the customs inspector in United States v. Villamonte-Marquez, 462 U.S. 579, 584 n.3 (1983), citing Scott v. United States, 436 U.S. 128, 135-39 (1978). Plaintiffs argue that the "extraordinary manner" of the officers' warrantless entry requires a "balancing analysis" focused on the officers' intent to arrest protesters and seize their property. But the unlawful arrest claims were dismissed because there was probable cause to believe plaintiffs were illegally occupying the building. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996).

Second, the district court took too narrow a view of the reasonableness, under the Fourth Amendment, of warrantless entries into condemned buildings. When a building has been condemned as unsafe for human occupation, it becomes, at least from the government's perspective, an abandoned structure. Public health and safety require that police officers, as well as building inspectors, have the right to access such structures at any time for a variety of reasons -- to evict illegal occupants, to seek out and seize contraband and hazardous substances that may be illegally hidden there, to eliminate dangerous conditions that might injure adventurous trespassers such as

who the police find to be unlawfully occupying a building condemned for occupancy, and who refuses their command to vacate the premises, may not object to the legality of their entry and removal by arrest.

-5-

children, and to prepare the premises for safe demolition. Though the parties failed to brief the issue, that this authority extends to police officers, as well as to code enforcement officials, is expressly confirmed by Section 119.6 of The Building Code of the City of St. Louis, adopted in 1999 by City Ordinance 64771:

> Vacation of buildings; duties of police; penalty: Upon effecting condemnation of any building, structure or premises by the code official, it shall be unlawful for any person to enter or remain in or on such building, structure or premises . . . . *It shall be the duty of the Police to remove any person from such building, structure or premises so condemned* and to prevent any person from entering same until such time as the Police Department shall have been notified in writing by the code official that such building . . . is in compliance with this code. (Emphasis added).[5]

Plaintiffs argued, and the district court agreed, that it is at least a jury question whether plaintiffs had reasonable expectations of privacy giving them standing to assert these Fourth Amendment claims because they were Green's invited residents and guests and had no knowledge the building was condemned. But even if plaintiffs have standing to assert Fourth Amendment claims, their limited standing as illegal occupants did not outweigh the authority of the police to enter the premises, when consent to enter was refused, for the purpose of evicting occupants of a building condemned as unsafe for human occupancy.[6] Whether warrantless entry in these circumstances is viewed as justified by exigent circumstances, see Welsh v.

---

[5]In 2005, this provision was reenacted as § 118.6 of the Building Code by City Ordinance 66790.

[6]For standing purposes, the district court equated 3309 Illinois to the fire-damaged premises in Michigan v. Clifford, 464 U.S. 287 (1984), and in Michigan v. Tyler, 436 U.S. 499 (1978). The issue is not free from doubt. See United States v. McRae, 156 F.3d 708, 711 (6th Cir. 1998). We need not decide it because, even if the analogy is sound, whatever standing it confers does not trump the City's police power to enter a condemned building that is unfit for human occupancy.

Wisconsin, 466 U.S. 740, 748-50 (1984), or by the government's on-going interest in controlling condemned buildings in the interest of public health and safety, the actions of the officers in entering without a warrant to arrest the illegal occupants was not constitutionally unreasonable.

Finally, plaintiffs cite no authority even suggesting, much less clearly establishing, that the police may not enter a condemned building to search for and seize contraband, evidence of crime, and items such as flammable liquids that should not be allowed to remain in an uninhabitable urban structure. Cf. New York v. Burger, 482 U.S. 691, 716-17 (1987).

For these reasons, the district court's denial of qualified immunity from these Fourth Amendment claims is reversed.

## B. First Amendment Claims

These six plaintiffs allege that the police officers' actions at 3309 Illinois violated their First Amendment right to protest because the Building Code Violation Enforcement Plan was devised and executed as a prior restraint on protester activities. The district court denied the police officers qualified immunity on these claims, concluding that reasonable police officers should have known that "selective and disproportionate use of police power to prevent the occurrence of a protest" would violate clearly established First Amendment rights, and that plaintiffs presented sufficient evidence that "a person of ordinary firmness would be deterred by this State action." We disagree.

It is undisputed that protesting peaceably is protected speech. Violent protest is not. See, e.g., NAACP v. Claiborne Hardware Co., 458 U.S. 886, 933 (1982) ("violent conduct is beyond the pale of constitutional protection"). Plaintiffs were not engaged in protected protest activity on the morning of May 16, 2003. They were unlawfully occupying a condemned building in which they had improperly stored

personal property, some of which could have been used in the future to engage in unprotected violent actions. Plaintiffs claim, in general terms, that their protected right to protest was chilled by defendants' pre-protest prior restraint. But plaintiffs carefully avoid the question whether the police actions in question were aimed at deterring, and in fact chilled, only unprotected violent protest activity. This distinction, ignored by the district court, is obviously critical.

Plaintiffs (other than Green) were lawfully arrested for illegally occupying a condemned building, and their property was properly removed from that structure. In these circumstances, their First Amendment claims fail for the same reason that the Supreme Court reversed a First Amendment overbreadth decision in Virginia v. Hicks, 539 U.S. 113, 123 (2003):

> Neither the basis for the [trespass] sanction . . . nor its purpose . . . has anything to do with the First Amendment. Punishing its violation by a person who wishes to engage in free speech no more implicates the First Amendment than would the punishment of a person who has (pursuant to lawful regulation) been banned from a public park after vandalizing it, and who ignores the ban in order to take part in a political demonstration. Here, as there, it is Hicks' nonexpressive *conduct* . . . not his speech, for which he is punished as a trespasser. (Emphasis in original.)

The district court itself, relying on Williams v. City of Carl Junction, 480 F.3d 871 (8th Cir. 2007), concluded that because there was probable cause to enforce the housing ordinance, the plaintiffs could not succeed on a claim of "selective enforcement" under the First Amendment with respect to proper code enforcement actions. This is a correct statement of the law of this circuit. See Smithson v. Aldrich, 235 F.3d 1058, 1063 (8th Cir. 2000); see also Barnes v. Wright, 449 F.3d 709, 720 (6th Cir. 2006) (cited favorably in Williams, 480 F.3d at 876); cf. Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1080-81 (8th Cir. 1990).

The district court posited that a "disproportionate police response" was sufficient to raise a genuine First Amendment issue of "selective enforcement." Neither the court nor plaintiffs on appeal cite any authority for the proposition that a policeman's decision to enforce a traffic law or a provision of the housing code, for example, is unconstitutional if it can be shown that he has enforced that law in a "selective" manner, not to retaliate for the violator's prior First Amendment protected activity, but to "chill" future First Amendment activity that the violator *may* be contemplating. We have found no federal appellate case granting or upholding First Amendment relief on this ground. The theory was alluded to and rejected in <u>Reno v. Arab-American Anti-Discrimination Committee</u>, 525 U.S. 471, 491 (1999), where the Supreme Court observed, "The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing," but did not "rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome." Here, plaintiffs do not identify the "disproportionate police response" that rendered the police conduct at 3309 Illinois so outrageous. The district court focused on the search of the premises and the seizure of plaintiffs' property after they were arrested, but we conclude that this police conduct was objectively reasonable when dealing with the illegal occupants of a structure that has been condemned for occupancy.

At a minimum, it was not clearly established in 2003 that a police officer could be liable on a "prior restraint" theory for making arrests that were supported by probable cause and then conducting a reasonable search and seizure of a condemned building. For these reasons, the district court's denial of qualified immunity from these First Amendment claims is reversed.

## C. Trinity Cross's Strip Search Claims

Paragraph 82 of plaintiffs' Second Amended Complaint alleged that, when she was arrested, "Trinity Cross . . . was subject to an unlawful strip search, a violation

of Missouri Statute, Title XXXVII, Section 544.193, pursuant to Section 544.195. . . . [T]he individual Defendants are liable for these state law violations." In her deposition, Cross testified that an unidentified female police officer, while performing a pat-down search outside of 3309 Illinois, lifted up Cross's shirt, exposing her bare breasts to those present, and pulled her pants down four inches below the top of her underwear.

In memoranda supporting their motion for summary judgment, defendants argued that (i) Cross failed to show she was subjected to a strip search, and (ii) in any event, defendants are entitled to official immunity and protection under the public duty doctrine from these state law claims. Plaintiffs' memorandum in opposition likewise argued only the state law immunity issues. The district court -- after concluding that Cross was arguably subjected to a strip search -- denied the police officers qualified immunity from a Fourth Amendment strip-search claim that seemingly was not pleaded and clearly was not argued, and then denied defendants' claims of immunity under state law without further discussion.

On appeal, defendants shift gears entirely, arguing that they are entitled to qualified immunity because Cross presented "no evidence that any of the defendants were directly involved in this strip search performed by an unnamed female officer." We decline to consider this fact-intensive issue because it is raised for the first time on appeal. We agree with defendants that, if the issue is properly raised, "each defendant's conduct must be independently assessed" in considering a multi-defendant motion for summary judgment on grounds of qualified immunity because liability for damages for a federal constitutional tort is personal. Wilson v. Northcutt, 441 F.3d 586, 591-92 (8th Cir. 2006); see Clark v. Long, 255 F.3d 555, 559 (8th Cir. 2001). Here, Cross testified that a female officer performed the search, and only one named defendant is a female officer who was present at 3309 Illinois, so at least some of the officer defendants appear to be entitled to qualified immunity from this claim. But the issue must be considered in the first instance by the district court.

-10-

## II. Claims Relating to the Events at 3022 Cherokee

After leaving 3309 Illinois, Inspector MacEnulty, accompanied by several police officers, went to nearby 3022 Cherokee. Acting on a "Project 87 Nuisance Property Form" that cited major structural deficiencies and overcrowding, MacEnulty asked owner Friederichs for consent to enter. Friederichs asked if he could refuse. MacEnulty said that failure to consent would result in an immediate order to vacate. Friederichs claims he consented only to MacEnulty entering and objected when police officers accompanied the inspector. Inside, the police saw what they believed were instruments of crime associated with violent protests. They returned later with a search warrant and seized, among other items, lighter fluid, clay spikes, a box of nails, a fuel canister, computer equipment, a large paper-mache doll resembling a police officer, gas masks, two-way radios, a chain, a box of mirrors, climbing equipment, a pottery kiln, and clay. Plaintiffs' complaint alleged that the "search of, seizing, and damaging this property" violated Friederichs's First and Fourth Amendment rights.

In the district court, defendants moved for summary judgment on the grounds that consensual entry and inspection of property lacking a valid occupancy permit did not contravene the Fourth Amendment, and that the First Amendment claim failed for lack of evidence of selective enforcement or chilling effect. Plaintiffs responded that Friederichs's consent was involuntary, and that these enforcement actions were intended to chill and did in fact chill Friederichs from exercising his First Amendment right to protest by attending Biodevastation 7. Plaintiffs also challenged the validity of the Project 87 form and the search warrant.

The district court (i) granted Inspector MacEnulty qualified immunity based upon Friederichs's consent to enter and inspect, (ii) denied the police officers qualified immunity from Friederichs's Fourth Amendment claims because consent to enter and the alleged property damage were disputed facts, and (iii) denied the police officers qualified immunity from Friederichs's First Amendment claim because

-11-

"whether this police action constituted selective enforcement" was also a genuine issue of disputed fact.

On appeal, defendants argue they are entitled to qualified immunity from Friederichs's Fourth Amendment claims because he presented no evidence that any named defendant damaged his property. This, too, is an issue we decline to consider because defendants did not raise it in the district court. Our jurisdiction to review an interlocutory order denying immunity is limited to determining "whether all of the conduct *that the district court deemed sufficiently supported for purposes of summary judgment* violated the plaintiff's clearly established federal rights." <u>Walker v. City of Pine Bluff</u>, 414 F.3d 989, 991 (8th Cir. 2005) (emphasis added) (internal quotation omitted). Defendants further argue they are entitled to qualified immunity from Friederichs's First Amendment claim because "no reasonable officer would have known that the entry and inspection of premises as part of enforcement of city ordinances" would chill a person of ordinary firmness from engaging in constitutionally protected speech. However, the limited record on appeal supports the district court's conclusion that there are genuine fact disputes regarding the validity of the Project 87 form, whether 3022 Cherokee was beset with major structural deficiencies and overcrowding, and whether Friederichs's personal property was in fact ransacked and damaged and, if so, for what reason. Accordingly, the interlocutory order denying qualified immunity on these First and Fourth Amendment claims must be affirmed.

### III. Conclusion

The order of the district court dated August 15, 2007, is affirmed in part and reversed in part, and the case remanded for further proceedings not inconsistent with this opinion. In a separate order dated August 17, 2007, the court denied Police Chief Joseph Mokwa's motion for qualified immunity from claims relating to the police actions at 3309 Illinois and 3022 Cherokee. That order was appealed, but the issue

was not briefed and therefore we do not consider it. The district court may of course revisit this order on remand.

BYE, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment in part.

Although I concur in the remainder of the opinion, I disagree with the majority's holding in regard to the 3309 Illinois property.

I.     The District Court Correctly Determined the Police Officers Were Not Entitled to Qualified Immunity for Their Warrantless Search of 3309 Illinois.

Under the law-of-the-case doctrine, I am bound by the district court's holding that Inspector MacEnulty's warrantless entry into 3309 Illinois for purposes of an administrative search did not violate the Fourth Amendment. See First Union Nat'l Bank v. Pictet Overseas Trust Corp., 477 F.3d 616, 620 (8th Cir. 2007) (holding the law-of-the-case doctrine applies to final decisions by the district court that have not been appealed). This holding is final because, at the plaintiffs' request, the district court entered final judgment on their Fourth Amendment claim against Inspector MacEnulty pursuant to Federal Rule of Civil Procedure 54(b). And, although the plaintiffs initially sought to appeal this determination, the appeal was later voluntarily dismissed. Therefore, I am bound by the district court's holding.

The majority expresses "little doubt" it was correct. I disagree. Except in closely-regulated industries, administrative searches are subject to the Fourth Amendment's warrant requirement. Michigan v. Clifford, 464 U.S. 287, 294 (1984); Michigan v. Tyler, 436 U.S. 499, 506 (1978); Marshall v. Barlow's, Inc., 436 U.S. 307, 324 (1978); Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 534 (1967); See v. City of Seattle, 387 U.S. 541, 545 (1967). Thus, Inspector MacEnulty was required to obtain an administrative warrant.

-13-

Hroch v. City of Omaha, 4 F.3d 693 (8th Cir. 1993), is inapposite. In Hroch, the appellee had received a final notice of condemnation of his property and had sought to enjoin its demolition, which the state court denied. Id. at 695. Hroch argued his Fourth Amendment rights were violated when his buildings were demolished without a warrant. Id. at 696. This Court disagreed. Id. at 697. In reaching its holding, the Court expressly relied upon the completion of administrative proceedings and subsequent judicial review, as well as the diminished privacy interests in a non-occupied commercial property. Id. at 696-97; see also Freeman v. City of Dallas, 242 F.3d 642, 654 (5th Cir. 2001) (holding the warrantless demolition of vacant commercial property did not violate the Fourth Amendment where administrative condemnation proceedings were completed).

In contrast, Green had not received a final notice of condemnation, and 3309 Illinois was an occupied residence. Indeed, in February 2002, after the housing inspector found none of the structural problems that were the basis of the structural condemnation notice, Green was granted a Certificate of Occupancy. Although this certificate was revoked in August 2002, and Green was provided a list of minor repairs to be made, the notice merely stated "[a] reinspection will be made in or about 30 days to determine your progress in correcting these violations . . . . [I]f no progress is being made . . . , the Code Official may . . . condemn for occupancy." Green then applied for, and received, a building permit in September 2002, and commenced making the repairs.

Thus, although the property might have remained technically condemned as of the date of the warrantless search, it is clear administrative proceedings were on-going. Inspector MacEnulty, therefore, needed an administrative warrant to enter the premises. See Camara, 387 U.S. at 534 (holding administrative searches by a housing inspector require a warrant).

Nonetheless, assuming, as I must, Inspector MacEnulty could enter 3309 Illinois without a warrant to conduct an administrative search, the majority relies upon

-14-

United States v. Villamonte-Marquez, 462 U.S. 579 (1983), to conclude the police officers could accompany him to pursue a criminal investigation.

Villamonte-Marquez, however, is factually limited to searches of sea vessels located in waters providing ready access to the open sea. 462 U.S. at 581. The Supreme Court expressly distinguished searches of such sea vessels from those of automobiles on land. Id. at 584-92. In particular, the First Congress expressly authorized the suspicionless boarding of sea vessels. Id. at 584 (Act of Aug. 4, 1790, ch. 35, 1 Stat. 164). "As this Act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment." Id. at 586-87 (quoting Boyd v. United States, 116 U.S. 616, 623 (1886)). The Court then specified several factual differences between "vessels located in waters offering ready access to the open sea and automobiles on principal thoroughfares in the border area," including the nature of waterborne commerce and the extent and type of documentation required. See id. at 588-93.

Despite the Supreme Court's refusal to extend its holding in Villamonte-Marquez to automobiles—in which a person has a lesser expectation of privacy than in a home, see South Damkota v. Opperman, 428 U.S. 364, 367 (1976)—the majority extends its holding to encompass the warrantless search of a home. It strains credulity that Villamonte-Marquez extends to searches of a home where Fourth Amendment protections are at their zenith. See Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (internal quotation marks omitted). The majority thus erroneously concludes the police officers could enter to conduct a criminal search merely because Inspector MacEnulty could enter to conduct an administrative search.

-15-

Rather, because their purpose was criminal, not administrative, the police officers were required to obtain a criminal warrant. See Clifford, 464 U.S. at 294, 298. In Clifford, arson investigators went to the Cliffords' house some five hours after a fire was extinguished. Id. at 290. Without an administrative or criminal warrant, they searched the basement and determined the fire originated there. Id. at 290-91. They then searched the remainder of the house. Id. at 291. The Cliffords were subsequently charged with arson, for which probable cause was established based on evidence obtained during the warrantless search. Id. at 289.

After reaffirming that "administrative searches generally require warrants," id. at 291, the Court held the purpose of a search was dispositive: "[i]f the primary object [of the search] is to determine the cause and origin of a recent fire, an administrative warrant will suffice"; but, "[i]f the primary object of the search is to gather evidence of criminal activity, a criminal search warrant [must] be obtained . . . ." Id. at 294.

The Court then made very clear that, once an administrative search turns into a search for criminal activity, a warrant is required. Id. at 294, 298. Because the investigators determined the cause and origin of the fire to be in the basement, "the search of the [remainder] of the house . . . could only have been a search to gather evidence of the crime of arson." Id. at 297. Thus, even if the basement search was a valid administrative search (which the Court held it was not), the search of the remainder of the house required a criminal warrant. Id. at 298 ("Although the investigators could have used whatever evidence they discovered in the basement to establish probable cause to search the remainder of the house, they could not lawfully undertake that search without a prior judicial determination that a successful showing of probable cause had been made.").

Here, any administrative search quickly became a criminal search. The police officers accompanying Inspector MacEnulty do not dispute the primary object of their search was to gather evidence of criminal activity. Under Clifford, they were

-16-

therefore required to secure a criminal warrant, and their failure to do so violated the Fourth Amendment.[7]

This analysis does not change because 3309 Illinois was condemned.[8]  As the Clifford court held, unless a house is in "ash and ruins," reasonable privacy expectations remain even if a home is uninhabitable.  Id. at 292; see also Tyler, 436 U.S. at 505 ("[E]ven if the petitioner's contention that arson established abandonment be accepted" and the house is uninhabitable, a home owner's expectation of privacy in her personal effects remains subject to Fourth Amendment protection.).

Significantly, all of the cases holding an individual occupying a property illegally does not have a reasonable expectation of privacy are cases where the individual *knew* his occupancy to be illegal.  See, e.g., United States v. Hunyady, 409 F.3d 297, 300-03 (6th Cir. 2005).[9]  Although these cases may support a holding Green

_____

[7]Whren v. United States, 517 U.S. 806 (1996), is not to the contrary.  In fact, Whren specifically distinguishes administrative searches.  517 U.S. at 811-12 ("[W]e never held, *outside the context of inventory search or administrative inspection . . . ,* that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment . . . .") (emphasis added); see also City of Indianapolis v. Edmond, 531 U.S. 32, 46 (2000) ("Whren does not preclude an inquiry into programmatic purpose . . . .").

[8]The majority relies upon the Building Code of the City of St. Louis to find otherwise.  Although prior Eighth Circuit precedent may have looked to state law to determine what is reasonable under the Fourth Amendment, see Bissonette v. Haig, 800 F.2d 812, 815 (8th Cir. 1986), the Supreme Court has recently held this approach to be incorrect, Virginia v. Moore, 128 S. Ct. 1598, 1604 (2008).  Because "state law [does] not alter the content of the Fourth Amendment," a city ordinance may not condone what the Fourth Amendment proscribes. Id.

[9]Similarly, in Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court's examples of " wrongful presence" for which a defendant did not have a legally protected expectation of privacy, involved situations where the defendant knew his presence to be unlawful.  Id. at 141 n.9 (automobile thief does not have a reasonable

did not have a reasonable expectation of privacy because he knew 3309 Illinois was condemned, Dupre, Meister, Cross, Locey, and Verhelst did not know the property was condemned.[10] Their reasonable expectation of privacy in the home was intact.[11]

Nor did exigent circumstances justify the officers' warrantless entry. There is no evidence the building was in severe disrepair. Occupying a condemned building is a minor violation—one for which persons typically are not arrested if they vacate willingly. When the underlying offense for which there is probable cause to arrest is minor, courts are especially hesitant to find exigent circumstances justifying warrantless entry into a home. Welsh, 466 U.S. at 750. Moreover, in Clifford, the Supreme Court held "[t]he object of the search is important [and a warrant may be required] *even if exigent circumstances exist*." 464 U.S. at 294 (emphasis added).

Accordingly, Dupre, Meister, Cross, Locey, and Verhelst had a reasonable expectation of privacy in 3309 Illinois, which the police officers violated when conducting a warrantless search for criminal activity. Because their constitutional

---

expectation of privacy in the stolen automobile); id. at 143 n.12 ("burglar plying his trade in a summer cabin during the off season" does not have a reasonable expectation of privacy in the cabin).

[10]As overnight guests of Dupre and Meister, Cross, Locey, and Verhelst had a reasonable expectation of privacy. See Minnesota v. Olson, 495 U.S. 91, 96-97 (1990).

[11]There have been other documented cases in St. Louis of landlords renting condemned properties. See Court Order Stops Landlords from Renting Condemned Property, Saint Louis Front Page, Mar. 16, 2001, http://www.slfp.com/031601City.htm (St. Louis business enjoined from renting condemned residential properties); Dirk Johnson, A Bitter Battle Fought on Two Housing Fronts, New York Times, Oct. 28, 1987, available at http://www.nytimes.com (St. Louis landlord sentenced to jail for renting apartments in condemned buildings). Unknowing tenants do not lose their Fourth Amendments rights merely because they rent from unscrupulous landlords.

-18-

right was clearly established, I would affirm the district court's denial of qualified immunity. See New York v. Burger, 482 U.S. 691, 724 (1987) (Brennan, J., dissenting) ("In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations.") (collecting cases). Therefore, as to the plaintiffs' Fourth Amendment claims arising from the illegal search of 3309 Illinois, I respectfully dissent.

II.     Under Circuit Precedent, the District Court Incorrectly Determined the Police Officers Were Not Entitled to Qualified Immunity for Selectively Prosecuting the 3309 Illinois Plaintiffs in Order to Suppress Their Protest Speech; However, Such Precedent Warrants Reconsideration.

Because the plaintiffs' First Amendment claim is based on an allegation the police selectively enforced St. Louis's building code in an attempt to prevent them from engaging in the impending protest, their claim should not be defeated merely because there was probable cause for their arrest for occupying a condemned building. Rather, the Court should consider whether the plaintiffs were "singled out for prosecution while others similarly situated have not been prosecuted for conduct similar to that for which [they were] prosecuted [and] that the government's discriminatory selection of [them] for prosecution was based upon . . . [their anticipated] exercise of [their] first amendment right to free speech." Osborne v. Grussing, 477 F.3d 1002, 1006 (8th Cir. 2007) (quoting United States v. Catlett, 584 F.2d 864, 866 (8th Cir. 1978)).

There is little question the plaintiffs were singled out because of their anticipated participation in the upcoming protest. Indeed, the express purpose of the "Building Code Enforcement Plan" was to target expected protesters. In addition, the police department typically does not initiate criminal prosecutions against persons for occupying condemned buildings. During his many years of service, Inspector MacEnulty was not contacted once by the police department about a condemned

building. Thus, there is a genuine issue of material fact whether the plaintiffs were selectively prosecuted.

The majority nonetheless condones the selective enforcement of the building code because the police officers' actions were allegedly aimed at deterring unprotected violent protest activity. The Supreme Court has made very clear, however, the police may not interfere with a protest merely because they fear possible violence. Cox v. Louisiana, 379 U.S. 536, 550 (1965); Edwards v. South Carolina, 372 U.S. 229, 237-38 (1963). Rather, the police may only interfere if there is a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order . . . ." Cantwell v. Connecticut, 310 U.S. 296, 308 (1940). Besides general allegations of protestor violence at prior World Agricultural Forums, the police officers did not have any evidence the plaintiffs were planning to engage in unprotected violent protest activity. While I am mindful the First Amendment does not insulate individuals from criminal sanction, when it comes to core First Amendment speech, such as political protest, the government may not use a hatchet where a scalpel will suffice. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 908 (1982).

Nonetheless, because I am bound by Circuit precedent, see Drake v. Scott, 812 F.2d 395, 400 (8th Cir.1987), I reluctantly concur in the judgment with respect to the plaintiffs' First Amendment claim. In Williams v. City of Carl Junction, 480 F.3d 871 (8th Cir. 2007), this Court held, for an ordinary retaliation claim, i.e. "where the government agent allegedly harboring the animus is also the individual allegedly taking the adverse action," Hartman v. Moore, 547 U.S. 250, 259 (2006), a plaintiff selectively prosecuted for exercising his First Amendment rights must demonstrate a lack of probable cause for the underlying criminal charge. Williams, 480 F.3d at 876.

In so holding, the Court erroneously extended Hartman, which solely addressed retaliatory-prosecution claims, i.e., where the government agent allegedly harboring

the animus "induced the prosecutor to bring charges that would not have been initiated without his urging." 547 U.S. at 262. In Hartman, the Supreme Court held a plaintiff in a retaliatory-prosecution action must plead and show the absence of probable cause for the underlying criminal charge. Because in a retaliatory-prosecution claim there is an intervening decision by a prosecutor to pursue criminal charges, which is accorded a presumption of regularity, the Court found a probable-cause requirement was necessary "to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action, and to address the presumption of prosecutorial regularity." Id. at 259, 263. As the Court took great care to explain, it was the "*differences* between retaliatory prosecution claims and [ordinary] retaliation claims [that] justified and necessitated the additional requirement in retaliatory prosecution claims." Skoog v. County of Clackamas, 469 F.3d 1221, 1234 (9th Cir. 2006) (emphasis added); see also Hartman, 547 U.S. at 259 ("It is . . . the need to prove a chain of causation from animus to injury, *with details specific to retaliatory-prosecution cases*, that provides the strongest justification for the no-probable-cause requirement espoused by the inspectors.") (emphasis added); id. at 259-63 (detailing the differences between retaliatory-prosecution and ordinary retaliation claims). Because the Supreme Court expressly distinguished retaliatory-prosecution actions from ordinary retaliation actions, and Hartman's rationale for requiring no probable cause is absent in ordinary retaliation actions, the Williams court incorrectly concluded Hartman's no-probable-cause requirement should also apply to ordinary retaliation actions. See CarePartners, LLC v. Lashway, --- F.3d ---, 2008 WL 4352597, at *6 n.7 (9th Cir. Sept. 25, 2008) (refusing to extend Hartman's probable-cause requirement to ordinary retaliation claims); Skoog, 469 F.3d at 1235 (same).

Nonetheless, the instant case is controlled by Williams, and the plaintiffs thus are required to prove an absence of probable cause to maintain their First Amendment claim. Because the police rather than a prosecutor initiated criminal proceedings against the plaintiffs, the instant case also presents an ordinary retaliation claim. Although the plaintiffs' claim is technically a prior restraint, rather than post-speech

retaliation, action, see Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67-68 (1963) (recognizing a criminal prosecution may constitute an impermissible prior restraint on speech), this distinction is without a difference under these circumstances. Therefore, under Williams, the plaintiffs' First Amendment claim must fail because there was probable cause for their arrest.

I write separately to express my strongly held view that the existence of probable cause should not defeat a claim for selective enforcement in the First Amendment context where there is no intervening action by a prosecutor. Although this is not the first time the "punitive machinery of government" has been employed to suppress protest speech, Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003), by refusing to hold the police officers accountable for their clearly unlawful conduct, our precedent ensures it will not be the last.

_____