PEOPLE v ANTWINE

Docket No. 297287. Submitted June 15, 2011, at Detroit. Decided June 28, 2011 at 9:00 a.m.

Lonnell Antwine was charged in Wayne Circuit Court, with possession with intent to deliver less than 50 grams of cocaine, MCL 333.7401(2)(a)(*iv*), possession of 25 grams or more, but less than 50 grams, of cocaine, MCL 333.7403(2)(a)(*iv*), and possession of a firearm during the commission of a felony, MCL 750.227b, as a second-offense habitual offender, MCL 769.10. The police had investigated a complaint that an unknown person was inside a condemned house. Defendant, the owner of the house, invited the police inside while he retrieved his car keys in order to get paperwork confirming his ownership of the house. Defendant was in the home during a time prohibited by the notice of condemnation. After observing children's clothing in a bedroom, the officers searched the remainder of the home to determine whether additional people were present. During the search, the officers saw a box with suspected crack cocaine and subsequently obtained a search warrant, pursuant to which they discovered further evidence. Defendant moved to quash his bindover, suppress seized evidence, and dismiss the charges, arguing in part that his Fourth Amendment rights and rights under Const 1963, art 1, § 11, had been violated because the police should not have conducted the initial search of his home absent a warrant or exigent circumstances. The court, Vonda R. Evans, J., determined that the owner of a condemned house retains a property right to possess it and that the search and seizure was illegal under a totality of the circumstances, suppressed the evidence, and dismissed the charges. The prosecution appealed.

The Court of Appeals *held*:

The police officers' search of the condemned house to secure it and ensure the presence of no other people did not violate the Fourth Amendment. For purposes of the search-and-seizure analysis regarding a person's reasonable expectation of privacy in a dwelling that he or she unlawfully occupies, two points were relevant: first, an overall reasonable expectation of privacy, not the existence (or lack thereof) of a property right, controls the analysis

and, second, wrongful presence weighs against a reasonable expectation of privacy. Public officials have a right to access condemned structures for a variety of reasons. The officers reasonably visited defendant's condemned home in response to a report that someone was unlawfully occupying it. When they arrived at 6:00 a.m., defendant allowed them entry and admitted he unlawfully tore down the condemnation notice stating that he could only be in the house between 8:00 a.m. and 8:00 p.m. Once the officers confirmed that defendant resided in the condemned house illegally, it was objectively reasonable for them to secure the home and look for other individuals unlawfully present. Contrary to the trial court's conclusion that the officers wanted to take advantage of the opportunity to search beyond a lawful scope, the officers' subjective intentions with respect to their motivation for searching the house was irrelevant to a proper Fourth Amendment analysis. Finally, the officers observed drugs in plain view during the initial search while lawfully securing the building; they did not exceed the scope of the initial, lawful search. Accordingly, defendant had no reasonable expectation of privacy that precluded the police from conducting the initial search of his house during which drugs were discovered in plain view. The trial court erred by granting defendant's motion to suppress and dismissing the charges.

Reversed and remanded for proceedings.

1. SEARCHES AND SEIZURES — FOURTH AMENDMENT — EXPECTATION OF PRIVACY — CONDEMNED HOUSES.

An overall reasonable expectation of privacy, not the existence (or the lack) of a property right, controls the Fourth Amendment analysis for purposes of an unreasonable search and seizure claim, and a defendant's wrongful presence weighs against a reasonable expectation of privacy; once police officers confirm that a defendant resides in a condemned house illegally, it is reasonable for them to secure the building and look for other illegal residents, and the defendant has no reasonable expectation of privacy that precludes the search.

2. SEARCHES AND SEIZURES — FOURTH AMENDMENT — SUBJECTIVE INTENT OF POLICE OFFICERS.

As long as he or she has probable cause, a police officer's subjective intention when conducting a search is irrelevant in an ordinary Fourth Amendment analysis.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Kym L. Worthy*, Prosecuting Attor-

ney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *David A. McCreedy*, Assistant Prosecuting Attorney, for the people.

*Daniel J. Rust* for defendant.

Before: FITZGERALD, P.J., and SAWYER and BECKERING, JJ.

PER CURIAM. The prosecution appeals as of right orders suppressing evidence seized from defendant's home and the resultant dismissal of the drug and weapons charges against defendant. The prosecution argues that the trial court erred when it concluded that defendant's Fourth Amendment right to be free from unreasonable searches and seizures was violated because police officers conducted a warrantless search of defendant's condemned home that he was unlawfully occupying. We agree with the prosecution and reverse the trial court's rulings.

We review de novo questions of law underlying a trial court's decision whether to suppress evidence. *People v Gadomski*, 274 Mich App 174, 178; 731 NW2d 466 (2007). We review for clear error findings of fact necessary to the court's decision. *People v Bolduc*, 263 Mich App 430, 436; 688 NW2d 316 (2004); MCR 2.613(C). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Swirles (After Remand)*, 218 Mich App 133, 136; 553 NW2d 357 (1996).

The Fourth Amendment of the United Stated Constitution, US Const, Am IV, and article 1, § 11 of the Michigan Constitution, Const 1963, art 1, § 11, prohibit unreasonable searches and seizures. *Bolduc*, 263 Mich App at 437. The Michigan constitutional provision is

generally construed to afford the same protections as the Fourth Amendment. *Id.* at 437 n 9. "[T]he Fourth Amendment protects people, as opposed to places or areas . . . ." *People v Taylor*, 253 Mich App 399, 404; 655 NW2d 291 (2002). Accordingly, "a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *Id.* Whether an expectation of privacy is reasonable depends on two questions. *Id.* at 404-405, citing *Bond v United States*, 529 US 334, 338; 120 S Ct 1462; 146 L Ed 2d 365 (2000). First, did the individual exhibit "an actual, subjective expectation of privacy"? *Taylor*, 253 Mich App at 404. Second, was the actual expectation "one that society recognizes as reasonable"? *Id.* "Whether the expectation exists, both subjectively and objectively, depends on the totality of the circumstances surrounding the intrusion." *Id.* at 405.[1]

This case arises from a police search of a house located in the city of Hamtramck. Defendant owned the house, which had been condemned as "unfit for human occupancy or use" because it lacked water service and a sanitary facility. A notice originally posted at the house stated in part, "IT IS UNLAWFUL FOR ANY PERSON TO USE OR OCCUPY THIS BUILDING AFTER 10/15/09" and *"ANY UNAUTHORIZED PERSON RE-MOVING THIS SIGN WILL [BE] PROSECUTED.*

---

[1] The prosecution in part phrases its argument in terms of whether defendant had standing to challenge the search. This Court has similarly addressed Fourth Amendment issues in terms of "standing." See, e.g., *Gadomski*, 274 Mich App at 178. But the central legal question remains whether, under Fourth Amendment jurisprudence, defendant could assert a privacy right under the circumstances. See *Rakas v Illinois*, 439 US 128, 139; 99 S Ct 421; 58 L Ed 2d 387 (1978) ("[W]e think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.").

*ENTRY ALLOWED FROM 8:00 A.M. TO 8:00 P.M. FOR CLEAN UP AND REPAIR ONLY*[.]" The police were notified that an unknown person was inside the house. Accordingly, at approximately 6:00 a.m. on November 3, 2009, Hamtramck police officers arrived at the house and went to the front door, which was padlocked. They observed lights and a television on inside. They knocked, announced themselves as police officers, and stated that they needed to speak to the person inside. A man inside answered, "Okay, I'll meet you in the back of the house." Defendant met them at the back door, explained that he owned the house, and stated that he had proof of ownership in his car and would get the keys to the car from inside the house. He allowed the officers to enter the house while he retrieved the keys.

The officers accompanied defendant to the northeast room of the house, where defendant retrieved his car keys. An officer went to the car and found paperwork confirming that defendant owned the house. The officers observed the condemnation notice on the floor of the house. Defendant admitted tearing down the notice and living in the house. The officers also observed several Ziploc baggies and a scale that appeared to have cocaine residue on it on the floor of the room from which defendant had retrieved his car keys.

The officers proceeded to search the house—including the attic and side bedrooms—to "find out if there was anybody else inside the residence." Officer Daniel Kruse testified that, although defendant told them no one else was in the house, Kruse saw children's clothing and shoes in a side bedroom. Kruse "couldn't leave the residence unsecured." They found no one, and the attic was empty. As the officers walked back down the dark attic stairs, however, Kruse shone his flash-

light onto a loose step and saw that it had "separated so that there was a hole." Kruse saw "a box, with a yellow baggie of what appeared to be crack cocaine" in the hole. On the basis of these observations, the officers obtained a search warrant for the house and executed the warrant later that day. They confiscated the scale and two or three baggies of cocaine. They also confiscated a loaded rifle from the enclosed back porch.

The prosecutor charged defendant with possession with intent to deliver less than 50 grams of cocaine, MCL 333.7401(2)(a)(iv), possession of 25 grams or more, but less than 50 grams of cocaine, MCL 333.7403(2)(a)(iv), and possession of a firearm during the commission of a felony, MCL 750.227b, as a second-offense habitual offender, MCL 769.10. Defendant moved to quash the bindover, suppress the seized evidence, and dismiss the charges. Most relevant to this appeal, he argued that his Fourth Amendment rights had been violated because the police should not have conducted the initial search of his home absent a warrant or exigent circumstances.

The trial court granted the motion to suppress and, because of the resulting lack of evidence, dismissed the case. The court concluded that the owner of a condemned house retains a property right to possess it and that this right to possession must be acknowledged in some way. The court focused on the officers' decision to go upstairs, finding that this "clearly went beyond the scope of why they were there." The court declined to believe their testimony that they were looking for other individuals unlawfully present. Rather, "they wanted to take advantage of it, and they wanted to search upstairs," although defendant had not given them permission to do so. The court concluded, "[T]here was no reason that they had to be upstairs, no exigent circum-

stances, nothing." Accordingly, the court held that the defense had shown by a preponderance of evidence that the resulting search and seizure was illegal under a totality of the circumstances and that the evidence should be suppressed.

The prosecution argues that a person can have no reasonable expectation of privacy in a dwelling that he or she unlawfully occupies. The prosecution cites cases that include *Rakas v Illinois*, 439 US 128; 99 S Ct 421; 58 L Ed 2d 387 (1978). *Rakas* is factually distinguishable because the defendants in that case neither owned nor asserted a possessory right in the car searched or the items seized from it. *Id.* at 148. But some of the *Rakas* Court's reasoning is helpful. First, *Rakas* reaffirmed that, even under a prior threshold for challenging a search described in *Jones v United States*, 362 US 257; 80 S Ct 725; 4 L Ed 2d 697 (1960), " 'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." *Rakas*, 439 US at 141 n 9. *Rakas* also drew upon *Katz v United States*, 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), which held that "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas*, 439 US at 143, citing *Katz*, 389 US at 353. *Rakas* and the cases cited therein thus suggest two relevant points: first, an overall reasonable expectation of privacy—not the existence (or the lack) of a property right—controls the analysis and, second, wrongful presence weighs against a reasonable expectation of privacy.

The prosecution also persuasively cites *Cross v Mokwa*, 547 F3d 890 (CA 8, 2008). There, the court upheld a warrantless police search of a condemned

home, as well as the arrest of the five people present for occupying a condemned building, even though the occupants were staying at the home with the owner's permission. *Id.* at 893-894. The court concluded that the warrantless entry was justified in light of the nature of condemned buildings and the duty of public officials to access such buildings for various reasons. It observed:

> When a building has been condemned as unsafe for human occupation, it becomes, at least from the government's perspective, an abandoned structure. Public health and safety require that police officers, as well as building inspectors, have the right to access such structures at any time for a variety of reasons—to evict illegal occupants, to seek out and seize contraband and hazardous substances that may be illegally hidden there, to eliminate dangerous conditions that might injure adventurous trespassers such as children, and to prepare the premises for safe demolition. [*Id.* at 895.]

The court reasoned that, even if the defendants had standing to challenge the search and seizure because they were invitees, "their limited standing as illegal occupants did not outweigh the authority of the police to enter the premises, when consent to enter was refused, for the purpose of evicting occupants of a building condemned as unsafe for human occupancy." *Id.* The court also specified that "the actions of the officers in entering without a warrant to arrest the illegal occupants was not constitutionally unreasonable," whether the entry was viewed as justified by exigent circumstances "or by the government's ongoing interest in controlling condemned buildings in the interest of public health and safety." *Id.* at 895-896.

We find the *Cross* court's reasoning persuasive. The officers reasonably visited defendant's condemned home in response to a report that someone was unlaw-

fully occupying it. When they arrived at about 6:00 a.m., defendant allowed them inside, where they confirmed that he had unlawfully torn down the notice stating that he could only be in the home between 8:00 a.m. and 8:00 p.m. Officer Andy Mileski testified that defendant "stated that he lives there, but . . . knew it was condemned" and "had ripped [the condemnation notice] down, himself." The officers also observed that defendant had "rigged" electric service "from the back" of the house. Critically, the defense admitted there was "no dispute" that defendant "should not have been in that house" and was "in fact in violation of the Hamtramck ordinance." The defense also expressly agreed that defendant "asked [the officers] to come in while he obtained the proof of the ownership of the house." Defendant's sole argument was that defendant did not expressly consent to the initial search and that his propriety interest in the house afforded him an expectation of privacy.

But once the officers confirmed that defendant resided in the condemned house illegally, it was reasonable for them to secure the home and look for other illegal residents; indeed, they were at the house precisely to investigate a report of illegal occupancy of a condemned home unfit for habitation. Further, once the officers saw children's clothing, this confirmed the reasonableness of their decision to search other areas of the house where individuals might be hidden.

Most significantly, the trial court's conclusion that the officers were not actually motivated to look for other individuals—but wished to take advantage of their presence for other purposes—is irrelevant to the Fourth Amendment analysis. Police officers' "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v United States,*

517 US 806, 813; 116 S Ct 1769; 135 L Ed 2d 89 (1996); see also *Cross*, 547 F3d at 895 (relying on *Whren* in the context of a search of a condemned building); *United States v Freeman*, 209 F3d 464, 467 (CA 6, 2000) (stating that a police officer may stop a vehicle for a traffic offense although the officer's actual motivation is to search for contraband as long as he or she has probable cause to make the initial stop). Here it was objectively reasonable for officers in their circumstances to secure the home and search for other unlawfully present individuals. Neither the trial court nor defendant cite any law to support their vague assertions that defendant's mere ownership of the house created a reasonable expectation of privacy that was wrongfully invaded under these circumstances. Put otherwise, society does not recognize defendant's right to privacy in the areas searched under these particular circumstances.

Finally, the officers observed the drugs in plain view while lawfully securing the house and searching it for other illegal occupants. Accordingly, they did not exceed the scope of the initial, lawful search when they discovered the drugs and used the discovery to obtain a search warrant. See *People v Galloway*, 259 Mich App 634, 639; 675 NW2d 883 (2003) ("The plain view exception to the warrant requirement allows a police officer to seize items in plain view if the officer is lawfully in the position to have that view and the evidence is obviously incriminatory."); cf *People v Wilkens*, 267 Mich App 728, 733-734; 705 NW2d 728 (2005) (holding that officers with owner's consent to search for a weapon did not exceed the scope of a lawful search—and properly obtained a warrant to seize a video camera placed in female tenants' shower—because the camera equipment was suspicious and in plain view during the initial search for a weapon).

For these reasons, defendant had no reasonable expectation of privacy that precluded the police from conducting the initial search of his house during which they discovered drugs in plain view. Accordingly, we reverse the trial court's March 3, 2010, orders suppressing the evidence seized and dismissing the case.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

FITZGERALD, P.J., and SAWYER and BECKERING, JJ., concurred.