*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LONG LAKE TOWNSHIP,

      Plaintiff-Appellee,

v

TODD MAXON and HEATHER MAXON,

      Defendants-Appellants.

FOR PUBLICATION
March 18, 2021

No. 349230
Grand Traverse Circuit Court
LC No. 18-034553-CE

Before: JANSEN, P.J., and FORT HOOD and RONAYNE KRAUSE, JJ.

FORT HOOD, J (*dissenting*).

I agree with the majority's analysis of the Federal Aviation Administration (FAA) regulation issue. I respectfully dissent, however, from the majority's conclusion that this case is distinguishable from the otherwise binding precedent of the United States Supreme Court. I too am deeply concerned about the particularly intrusive nature of drones as compared to other aircraft with respect to the Fourth Amendment and the right to be free from unreasonable searches, but I do not believe that concern provides us a basis to sidestep the precedent by which we are bound.

As the majority notes, "a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (quotation marks and citation omitted). Whether such an intrusion has occurred requires that we first analyze whether there was "an actual, subjective expectation of privacy," and next analyze whether that expectation was "one that society recognizes as reasonable." *Id*. (quotation marks and citations omitted). Fundamental to the case at bar, however, is that "[w]hat a person knowingly exposes to the public, even in his own home or office, is *not* a subject of Fourth Amendment protection." *Katz v United States*, 389 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967) (emphasis added). "[M]ere observation from a vantage point that does not infringe upon a privacy interest, *of something open to public view*, normally implicates no Fourth Amendment constraints because observation of items readily visible to the public is not a 'search.' " See also *People v Barbee*, 325 Mich App 1, 7; 923 NW2d 601 (2018) (quotation marks and citation omitted) (emphasis added).

As the majority further notes, and with specific regard to aerial observations, the Supreme Court of the United States has held that property plainly visible from a "public navigable airspace" tends not to be subject to Fourth Amendment protection. *California v Ciraolo*, 476 US 207, 211-214; 106 S Ct 1809; 90 L Ed 2d 210 (1986). In *Ciraolo*, the defendant did not have a reasonable expectation of privacy in marijuana plants that, despite being intentionally concealed from street-level view by a 10-foot privacy fence, were observable from the naked eye at an altitude of 1,000 feet. *Id*. at 211, 215. Even noting that there is reasonable concern with respect to "future 'electronic' developments that could stealthily intrude upon an individual's privacy," the Court concluded that, on the basis that "private and commercial flight in the public airways is routine," "[t]he Fourth Amendment simply does not require the police traveling in the public airways . . . to obtain a warrant in order to observe what is visible to the naked eye." *Id*. at 215.

In *Florida v Riley*, 488 US 445; 109 S Ct 693; 102 L Ed 2d 835 (1989), the Supreme Court reaffirmed this principle when it again noted, "[a]s a general proposition, the police may see what may be seen 'from a public vantage point where [they have] a right to be.' " *Riley*, 488 US at 449, quoting *Ciraolo*, 476 US at 214. In *Riley*, the Supreme Court concluded that a helicopter that surveilled the defendant's property from a height of 400 feet did not impede upon the defendant's privacy rights because the State was "free to inspect the [defendant's] yard from the vantage point of an aircraft flying in the navigable airspace . . . ." *Riley*, 488 US at 450. The Supreme Court noted that the defendant in that case "no doubt intended and expected that his greenhouse would not be open to public inspection, and the precautions he took protected against ground-level observation." *Id*. However, "[b]ecause the sides and roof of his greenhouse were left partially open . . . what was growing in the greenhouse was subject to viewing from the air."[1] *Id*.

The majority distinguishes *Ciraolo* and *Riley* from this case by noting that unmanned drones are smaller, quieter, and more discreet than manned airplanes or helicopters. That is, the majority essentially concludes that *Ciraolo* and *Riley* categorically do not apply to cases involving drones. Again, I agree that drones *can* be inherently more intrusive than the manned aircraft at issue in those cases, but I do not believe *Ciraolo* and *Riley* can be so sweepingly distinguished.

First, I am not confident the distinction between manned and unmanned aircraft should carry so much weight. In *Ciraolo*, for example, the evidence at issue was a photograph taken from a plane, viewing what was visible to the naked eye. See *Ciraolo*, 476 US at 209. To that end, and second, although a drone is smaller than an airplane or helicopter, there is no evidence that the photographs captured in this case were dissimilar in kind to that of photographs and observations that may be taken from the vantage point of an airplane or helicopter.[2] Third, although drones may

---

[1] And, as the majority notes, a majority of the *Riley* Court concluded that compliance with FAA regulations was not the relevant inquiry for Fourth-Amendment purposes, "but rather whether [the defendant's] expectation of privacy was rendered illusory by the extent of public observation of his backyard from aerial traffic at 400 feet." *Riley*, 488 US at 464-465 (BRENNAN, J., dissenting).

[2] I note defendants' argument that the digital photography at issue went beyond "typical videos" and that plaintiff utilized enhanced technology that was capable of "zooming in and out to obtain more details than [a person] could get from just a naked eye observation or a vantage point of more

not occupy the same publicly navigable airspace as other aircraft, they do occupy airspace that is navigable by the public.[3]  Lastly, for the purposes of our review, I would think on the basis of the caselaw that of equal importance to the distinctiveness of drones as compared to other aircraft is the extent to which drones are readily available to and utilized by the public.

Related to this point is the majority's reliance on *Kyllo v United States*, 533 US 27; 121 S Ct 2038; 150 L Ed 2d 94 (2001) over *Ciraolo* and *Riley*.  The majority contends that drone observation is, by nature, similar to the intrusive surveillance that occurred in *Kyllo*.  However, *Kyllo* involved infrared thermal imaging of the defendant's home.  Our Supreme Court concluded with respect to that surveillance:

> Where, as here, the Government uses a device that *is not in general public use*, to explore details of the home that *would previously have been unknowable without physical intrusion*, the surveillance is a 'search' and is presumptively unreasonable without a warrant.  [*Kyllo*, 533 US at 40 (emphasis added).]

In my opinion, the fundamental import of *Ciraolo*, *Riley*, and *Kyllo*, is that if the drone that was used to view defendants' property in this case was a technology commonly used by the public that observed only what was visible to the naked eye and that was flown in an area in which any member of the public would have a right to fly their drown—and the record suggests that all of these things are true—then precedent provides that a Fourth-Amendment violation has not occurred.  See *Ciraolo*, 476 US at 215; *Riley*, 488 US at 450; *Kyllo*, 533 US at 40.

Defendants have not provided any evidence that the type of drone used in this case was a technology unavailable to the general public.  Contrarily, drones are generally widely available to the public,[4] there is reason to believe that the public commonly flies them at altitudes of 400 feet and below,[5] and there is no evidence in this case that the drone in question was flying at a particularly invasive altitude or in a particularly invasive manner, or that the drone contained or

---

than 400 feet to 12,000 feet in the air[.]"  There is no evidence, however, that the drone "videotaped" defendants' property at all, or that the drone utilized "advanced technology" not otherwise accessible to the public.

[3] The FAA regulations cited by majority demonstrate this fact.

[4] There were 873,144 drones registered with the FAA as of February 2021, and the FAA stated that drones "are rapidly becoming a part of our everyday lives." Federal Aviation Administration, UAS by the Numbers, <https://www.faa.gov/uas/resources/by_the_numbers/> (accessed February 2, 2021).  And, notably, not every drone used for recreational purposes is required to be registered with the FAA.  Federal Aviation Administration, Register Your Drone, < https://www.faa.gov/uas/getting_started/register_drone/> (accessed February 2, 2021).

[5] The FAA specifically instructs recreational drone users to fly their drones "at or below 400 feet when in uncontrolled . . . airspace."  Federal Aviation Administration, Recreational Flyers & Modeler Community-Based Organizations, <https://www.faa.gov/uas/recreational_fliers/> (accessed February 1, 2021).  See *Drone Operating Rules*, 14 CFR 107.11-107.51 (2016).

used any particularly invasive technology. Similar to *Ciraolo* and *Riley*, there is reason to believe that any member of the public could have used their own drone and plainly viewed the property at issue in this case.[6] See *Ciraolo*, 476 US at 213-214; *Riley*, 488 US at 449-451. With the above in mind, I would emphasize the common availability and use of drones by the public in determining whether defendants had a reasonable expectation of privacy in this case. That, in conjunction with whether the drone in this case was lawfully deployed in the public airspace, should control over our policy concerns with respect to how drones may be operated in future cases.

The majority addresses this idea by noting that a person's reasonable expectation of privacy does not evaporate simply because an invasion into privacy becomes technologically feasible. I agree, but I find the majority's extension of that logic to create a Fourth-Amendment violation in this case problematic, particularly in light of the cases the majority relies upon: *People v Stone*, 463 Mich 558; 621 NW2d 702 (2001), and *Kyllo*. In *Stone*, our Supreme Court held, on the basis of Michigan eavesdropping statutes, that a person has a reasonable expectation of privacy in certain telephone conversations despite the fact that technology makes it possible for others to eavesdrop on those conversations. *Stone*, 463 Mich at 568. Outside of the idea that advances in technology do not automatically obfuscate a person's reasonable expectation of privacy, *Stone* has little import to the case at hand.[7] Similarly, and as noted above, *Kyllo* involved infrared thermal imaging of the defendant's home, and it was fundamental to the result in that case that the technology employed by the police was both invasive and not ordinarily available or used by the general public. *Kyllo*, 533 US at 34, 40.

Ultimately, I do not believe *Kyllo* and *Stone* provide us a basis to sidestep *Ciraolo* and *Riley*. And, while I too have concerns about the potentially intrusive nature of drones, I would not categorically conclude that the use of drones without a warrant violates the Fourth Amendment where one is used to view what is otherwise plainly visible to the naked eye from airspace navigable by the public. That type of rule may be crafted by the Legislature, but for the purposes of our review, I would think that whether an unreasonable search has occurred for Fourth-Amendment purposes should continue to be question we address on the basis of the totality of the circumstances in each case. See *People v Woodard*, 321 Mich App 377, 383; 909 NW2d 299 (2017) (noting that the "touchstone" of Fourth-Amendment protections is reasonableness, and is measured by examining the totality of the circumstances).

---

[6] Again, the existence of a privacy fence in this case did not imbue in defendants a reasonable expectation of privacy in what was readily and legally viewable from above. See *Ciraolo*, 476 US at 211, 215; *Riley*, 488 US at 450.

[7] And notably, technological advances have not obfuscated a privacy interest that defendants otherwise would have had. There appears to be little in the way of argument to say that, had plaintiff flown a helicopter at a relatively low altitude and captured substantially similar images to those captured by the drone, the majority might feel inclined to reach a different conclusion. See *Riley*, 488 US at 451 (noting that the helicopter in that case was flown at an altitude of 400 feet). I do not see the purpose in distinguishing the two aircrafts under the facts of this case when either could be used to view property plainly visible in a substantially similar manner from publicly navigable airspace.

With all of the above in mind, again, there is no evidence that the drone in this case was flown in violation of the law or applicable regulations, nor that it contained equipment or was itself technology not readily available or generally used by the public. The fundamental principle from both *Ciraolo* and *Riley* is that the property observed in those cases was observable by commercial and public aircraft in the publicly navigable airspace, see *Ciraolo*, 476 US at 215; *Riley*, 488 US at 450, and the fundamental difference between those two cases and *Kyllo* was that the technology in *Kyllo* was not something that could be reasonably expected to be employed by members of the public, *Kyllo*, 533 US at 34, 40. On that basis, I would conclude that no Fourth-Amendment violation occurred in this case, and I would affirm the trial court's order denying defendants' motion to suppress.

/s/ Karen M. Fort Hood