*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SHAWN FEAON PICKENS,

        Defendant-Appellant.

UNPUBLISHED
April 15, 2021

No. 347406
Ingham Circuit Court
LC No. 17-000404-FC

Before: CAMERON, P.J., and K. F. KELLY and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to murder, MCL 750.83, carrying a concealed weapon (CCW), MCL 750.227, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to life imprisonment for the murder conviction, 375 to 700 months' imprisonment for the assault conviction, 24 to 60 months' imprisonment for the CCW conviction, and 24 months' imprisonment for the felony-firearm conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant's convictions arose from his entry into a crowded barbershop where he shot and killed a barbershop patron seated on a window ledge and shot another patron near the intended victim. The victim was able to fire his own weapon back at defendant, injuring him. When defendant shot the victim, he stood in front of a woman also seated on the ledge, and she identified him at trial as the shooter. Defendant fled the scene in a burgundy Bonneville or Grand Prix, but was dropped off at the hospital by the driver of a white Mercury Mountaineer. At the hospital, he declined to tell police the location of his shooting and to provide any identification of the shooter. The police were given his clothing and cell phone by hospital personnel. The prosecutor presented direct eyewitness testimony to support defendant's identification as the perpetrator, and defendant was convicted as charged.

## II. PROSECUTORIAL MISCONDUCT

Defendant alleges that he was deprived of a fair trial when the prosecutor knowingly presented false identification testimony from the key eyewitness to the shooting. We disagree.

To preserve a claim of prosecutorial misconduct, there must be a contemporaneous objection and a request for a curative instruction. *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016). Although defendant moved for a directed verdict by questioning the eyewitness testimony, he did not allege that the prosecutor deliberately presented false testimony, and no curative instruction was given. When prosecutorial statements are not challenged with contemporaneous objections and requests for curative instructions, this Court reviews the unpreserved issue for plain error affecting the defendant's substantial rights. *Id*. at 201-202.

"To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights." *People v Lockridge*, 498 Mich 358, 392-393; 870 NW2d 502 (2015). The requirement that the error was plain generally requires a showing of prejudice such that the error affected the outcome of the lower court proceedings. *Id*. Even if the plain error criteria are satisfied, the appellate court must exercise discretion in determining if reversal is warranted. *Id*. "Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independently of the defendant's innocence." *Id*. Defendant failed to show plain error affecting his substantial rights.

Prosecutorial misconduct[1] issues are evaluated on a case-by-case basis. *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017). To obtain relief for a claim of prosecutorial misconduct, a defendant must demonstrate that he was denied a fair trial. *People v Bosca*, 310 Mich App 1, 26; 871 NW2d 307 (2015). When a claim of misconduct is premised on a prosecutor's statements, the remarks must be examined in context to determine if the defendant was denied a fair and impartial trial. *Mullins*, 322 Mich App at 172. The statements must be assessed in light of the defense arguments and the relationship between the comments and the evidence presented at trial. *Id*. With regard to argument, the prosecutor has great latitude and is free to argue the evidence and all reasonable inferences arising from the evidence as it relates to the theory of the case. *Id*.

A claim of prosecutorial misconduct cannot be premised on a good-faith effort to admit evidence because the prosecutor may seek to introduce evidence that he legitimately believes will be admitted by the court. *People v Noble*, 238 Mich App 647, 660-661; 608 NW2d 123 (1999). Pursuant to their constitutional obligations of due process and fundamental fairness, prosecutors must report to the trial court and the defendant when government witnesses lie under oath. *People v Herndon*, 246 Mich App 371, 417; 633 NW2d 376 (2001). "[T]he prosecutor may not knowingly

---

[1] Although defendant characterizes the prosecutor's questions and statements as misconduct, this Court recently explained that a fairer label for most claims of prosecutorial misconduct would be "prosecutorial error," because only the most extreme and rare cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). However, we will use the phrase "prosecutorial misconduct" because it has become a term of art in criminal appeals. *Id*.

use false testimony to obtain a conviction and . . . a prosecutor has a duty to correct false evidence." *Id*.

Contrary to the defense assertion, there is no indication in the record that eyewitness Yemora Williams testified falsely. A conflict between a witness's description of an assailant and other relevant evidence presents an issue for resolution by the jury. See *People v Savage*, 327 Mich App 604, 614; 935 NW2d 69 (2019). This Court must defer to the jury's role in determining the weight of the evidence and the credibility of the witnesses, and we resolve conflicts in the evidence in favor of the prosecution. *Id*. The jury may believe or disbelieve, in whole or in part, the evidence admitted at trial. *People v Unger*, 278 Mich App 210, 228; 749 NW2d 272 (2008). That is, the trier of fact has the right to disregard all, part, or none of the testimony of a witness. See *People v Goodchild*, 68 Mich App 226, 235; 242 NW2d 465 (1976). Thus, this Court will not weigh the competing evidence because the jury had the special opportunity to do so while assessing the credibility of the witnesses that appeared before it. *Unger*, 278 Mich App at 228-229.

The jury did not find, and we have no reason to conclude, that Williams testified falsely. More importantly, there is no indication in the record that even if Williams did testify falsely, that the prosecutor knew she would not testify truthfully. See *Herndon*, 246 Mich App at 417. Williams testified that she brought her son to the barbershop and was seated on the ledge closest to the door with her son next to her. A man entered the barbershop, and her view was at his waist level because of her seated position. The man reached into his pants, and Williams was about to admonish him for his inappropriate conduct when he pulled a gun and began firing. Williams testified that she pushed her son behind her and leaned away from the gun. She could hear return gunfire. Williams was able to describe defendant's appearance. Although she may have contradicted defendant's race or skin-tone between her statements and 911 call, Williams expressed that she could identify defendant because of his eyes.

When examined in light of testimony from other witnesses, Williams appeared to be mistaken that, after defendant left the barbershop, he approached her for a ride to the hospital. Williams testified that defendant left the barbershop before her and then paused at a wall. However, she went in the opposite direction, lived by the "street code" that what occurred was none of her business, and had a criminal history in her past that she attributed to drug and alcohol use. She had no intention of testifying and was surprised when the police were able to contact her from her 911 call. However, Williams changed her mind when she was contacted by her niece who knew the victim's family. Williams recognized that her statements regarding the skin-tone of defendant varied, but explained that she was emotional and excited after the shooting when she made her 911 call.

Williams may have believed that defendant followed her to her car and requested a ride, but Francoise Bigelow left the barbershop with her son after his hair was cut. She was parked directly in front of the barbershop when she heard popping sounds and saw the window of the barbershop vibrating. She told her son to leave the passenger side of the car and come to her at the driver's side. She saw a man exit the barbershop carrying a silver gun. Bigelow did not see this man follow Williams to the parking lot and request a ride. Rather, she saw him proceed to and enter a waiting vehicle, and the vehicle sped off.

Similarly, Jordin Ward was in his vehicle, stopped at a traffic light near the barbershop when he heard 12 to 15 "pops" that sounded like fireworks. Ward saw a man run from the barbershop with a chrome color gun in his hand and jump into the passenger side of a burgundy Bonneville or Grand Prix, which was in the driveway on the side of the building, but then sped off. Ward then witnessed multiple people come out of the barbershop, including an older woman and child. A white male, Isiah Naranjo-Gale (Gale), was shot and bleeding, banged on Ward's passenger window, and stated, "Call 911." Accordingly, Ward testified consistently with Bigelow, that defendant left the barbershop carrying his silver gun in his hand and fled in a waiting vehicle. Thus, when Williams was approached by a man in the parking lot, she identified defendant, but it was presumably Gale because defendant immediately left the scene according to Ward and Bigelow.

However, a conflict in the evidence between the testimony of Williams, Bigelow, and Ward required the jury to evaluate the credibility of the witnesses, and the jury was not required to believe all of the testimony offered by Williams. Rather, in accordance with the criminal jury instructions, M Crim JI 2.6 entitled Judging Credibility and Weight of Evidence, the jury does "not have to accept or reject everything a witness says," but is "free to believe all, none, or part of any person's testimony." See also *Unger*, 278 Mich App at 228; *Goodchild*, 68 Mich App at 235. The jury was entitled to conclude that Williams positively identified defendant as the shooter in light of the fact that he stopped immediately in front of her, pulled a gun, and began firing. Williams was able to advise that the victim returned gunfire in light of the sound of the exchange occurring from another area of the room. Moreover, Williams explained her history and indicated why she would be mistaken as to the identification of defendant approaching her instead of Gale. Williams lived by a "street code," had a criminal past, and had no intention of testifying at trial. However, after being contacted by her niece and empathizing that the victim was a son to a mother, Williams agreed to come forward. Thus, the jury was entitled to give credence to the identification by Williams that defendant was the barbershop shooter. Despite defendant's assertion, a mistake by Williams regarding who approached her in the parking lot (as indicated by the testimony of Bigelow and Ward) does not equate with the prosecutor presenting false or perjured testimony. The jury was able to account for witness mistakes in testimony because jurors need not accept all of it in order to find a witness credible. Defendant failed to establish plain error affecting his substantial rights.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant asserts that there was insufficient evidence of his identification[2] as the barbershop shooter to support his convictions and sentences. We disagree.

A challenge to the sufficiency of the evidence is reviewed de novo. *People v Thorne*, 322 Mich App 340, 344; 912 NW2d 560 (2017). The evidence is examined in a light most favorable to the prosecution to determine whether a rational trier of fact could conclude that the prosecutor proved the elements of the crime beyond a reasonable doubt. *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019). "Conflicting evidence and disputed facts are to be resolved by the

---

[2] Defendant does not protest the sufficiency of each element of his convicted offenses, but rather, solely challenges his identification. Therefore, our analysis of this issue is similarly limited.

trier of fact." *Id.* The credibility of identification testimony presents a question for the jury that this Court does not resolve anew. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime." *Id.*

There was sufficient evidence to support defendant's identification as the barbershop shooter and, in turn, his convictions. Williams expressly testified that she was seated on the window ledge of the barbershop when defendant entered. He stood in front of her and pulled a gun from his pants and began firing. Although Williams initially believed that defendant wore a mask, at trial, she testified that she believed it was his hoodie. Williams admittedly gave various descriptions of defendant's skin-tone to the 911 operator and the police. However, she expressed with certainty, by his eyes, that defendant was the shooter.

Indeed, cell phone data placed defendant in the area of the barbershop. Because the barbershop was located near the home of defendant's employer it was equally plausible that the tracking data reflected his presence at that home. However, the individual who drove defendant to the hospital testified that defendant told her he was shot in the barbershop, albeit without admitting that he was the shooter. Conflicts in the evidence and credibility determinations were for the trier of fact to resolve. *Unger*, 278 Mich App at 228-299.

Finally, Williams testified that defendant was shot in the side when he left the barbershop, and he appeared at the hospital with a gunshot wound to his left abdomen. The jury found by its verdict that the identification by Williams coupled with the circumstantial evidence of defendant's injury and his phone records was proof beyond a reasonable doubt that defendant entered the barbershop, killed the victim, assaulted nearby bystander Gale by shooting him, and did so contrary to Michigan's firearm statutes. Viewing the evidence in the light most favorable to the prosecution and in light of the jury's assessment of the credibility of the witnesses, there was sufficient evidence for the jury to find defendant's identification as the barbershop shooter.

## IV. SEARCH AND SEIZURE

Defendant next contends that the trial court improperly admitted cell phone data[3] that was obtained as a result of an unreasonable and unconstitutional search. We disagree.

---

[3] Defendant's statement of the issue refers solely to cell phone data. Furthermore, he does not distinguish between whether the information was recovered from defendant's actual cell phone or whether the data itself was recovered through a court order directed to defendant's cell phone carrier. Additionally, in the discussion of the issue, defendant contends that the police improperly obtained his cell phone, clothing, and wallet without a search warrant. An issue is not properly presented for review because it has not been raised in the statement of questions presented, *Unger*, 278 Mich App at 262, and the statement of the issue does not address the wallet or clothing. Despite the disparity in the presentation, defendant failed to demonstrate plain error regardless of the item recovered by the police.

-5-

This issue was not raised in the trial court, and therefore, it is unpreserved. *Solloway*, 316 Mich App at 197. Unpreserved claims of constitutional error are reviewed for plain error. *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020).

Defendant failed to demonstrate plain error affecting his substantial rights. The Fourth Amendment protects people instead of places and things. *People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011). For purposes of the Fourth Amendment, a search occurs when there is a government intrusion on an individual's reasonable or justifiable expectation of privacy. *Id*. Recently, in *People v Madhi*, 317 Mich App 446, 457-458; 894 NW2d 732 (2016), this Court summarized the law governing search and seizure:

> The United States and Michigan Constitutions protect against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, section 11. The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The corresponding provision of the Michigan Constitution provides, in part, "The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures." Const 1963, art 1, section 11. Whether a search or a seizure is lawful depends on whether it is reasonable. *People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014). Therefore, "a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (citation and quotation marks omitted).

> "In general a search conducted without both a warrant and probable cause to believe evidence of wrongdoing might be located at the place searched are unreasonable per se." *Lavigne v Forshee*, 307 Mich App 530, 537; 861 NW2d 635 (2014). "And, generally, when evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial." *People v Chowdhury*, 285 Mich App 509, 516; 775 NW2d 845 (2009) (citations and quotation marks omitted).

To determine if an individual had a reasonable expectation of privacy, there must be an examination of whether the individual exhibited an actual subjective expectation of privacy and whether the actual expectation is one that society recognizes as reasonable. *Antwine*, 293 Mich App at 195. However, what a person knowingly exposes to the public is not given Fourth Amendment protection. *People v Lillis*, 181 Mich App 315, 318; 448 NW2d 818 (1989), citing *Katz v United States*, 489 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967).

However, there are exceptions to the warrant requirement that include: (1) searches incident to arrest, (2) automobile searches and seizures, (3) plain view seizure, (4) consent, (5) stop and frisk, and (6) exigent circumstances. *People v Davis*, 442 Mich 1, 10; 497 NW2d 910 (1993). Additionally, when the police are providing emergency aid or community caretaking, the

police are generally not searching for evidence of a crime, but for someone in need of assistance, and therefore, this may serve as an exception. *Id*. at 11-12.

When a defendant moves for suppression of evidence by alleging that it was illegally obtained, the prosecutor bears the burden of showing that the search and seizure was justified by an exception to the warrant requirement. *People v Jordan*, 187 Mich App 582, 589; 468 NW2d 294 (1991). In *Jordan*, the victim was using an automatic teller machine at a local bank branch when the defendant attempted to rob him at gunpoint. The victim was also armed and thwarted the attempted robbery by shooting the defendant first. The defendant was driven from the scene by an accomplice and taken to the local hospital. He was in surgery when a police officer arrived. The officer requested defendant's clothing, and the hospital staff gave it to him. The officer had to physically open the bag to determine that he was given the defendant's clothing. *Id*. at 584-585. Before trial, defense counsel moved to suppress the clothing because it was obtained without a search warrant, but the motion was denied. *Id*. at 585.

On appeal, this Court concluded that there was no evidence that defendant intended to abandon his clothing, and the hospital possessed the clothing as a bailee. Thus, it was their duty to safeguard it. *Id*. at 592. This Court concluded that the trial court clearly erred in denying the motion to suppress. However, it went on to conclude that the admission of the evidence was harmless error, stating:

> A two-tiered analysis is used in determining whether an error concerning the erroneous admission of evidence is harmless. First, it must be determined whether the error is so offensive to the maintenance of a sound judicial system that it can never be regarded as harmless and, second, whether the error was harmless beyond a reasonable doubt so that not even one juror, or, in the event of a bench trial, the judge, would have voted to acquit the defendant but for the error. *People v Robinson*, 386 Mich 551, 563; 194 NW2d 709 (1972). The first criterion is intended to deter prosecutorial and police misconduct, while the second is intended to safeguard the decisional process. *People v Furman*, 158 Mich App 302, 317; 404 NW2d 246 (1987). An error may be intolerably offensive to the maintenance of a sound judicial system if it was deliberately injected into the proceedings by the prosecution, if it deprived the defendant of a fundamental element of the adversarial process, or if it is of a particularly inflammatory or persuasive kind. *Id*., p 318.

> Upon review of the record, we believe that, even if the evidence had been excluded, it is unlikely defendant would have been acquitted in light of the victim's positive and independent identification of defendant, which was based on his physical appearance and not on the clothing he was wearing at the time of the assault. We also believe that defendant's misidentification defense had little chance of success when he was hospitalized for several weeks recuperating from a gunshot wound. He was positively identified by [the victim] and had the bullet wound to prove it. Moreover, it cannot be said that the error was deliberately injected into the trial by the prosecutor, but rather occurred as a result of the court's pretrial ruling that the evidence was admissible. Considering there was no Michigan case law on point and that only four other states had addressed the issue, it can hardly be said that the error was knowing or purposeful. [*Id*. at 593-594.]

Applying the above caselaw to the present factual scenario, we conclude that the facts and circumstances of the police officer's retrieval of the clothing from the hospital was not thoroughly addressed because the issue of suppression of this evidence was not raised in the trial court. Thus, it cannot be determined that an exception, such as exigent circumstances, applied to the retrieval of the clothing and cellular telephone.

However, defendant fails to explain how the failure to obtain a warrant for the items harmed him. Indeed, defendant's arrival at the hospital was preserved on video. Thus, it was known that he was dropped off at the hospital by an individual driving a Mercury Mountaineer, and the clothes that he wore were shown when he entered the hospital. Furthermore, the location of defendant's injury was testified to by patrons of the barbershop. Additionally, his sweatshirt was left at his employer's home. To the extent that the articles of clothing demonstrated that defendant was injured by a gunshot, this was cumulative to the admission of defendant's medical records at trial. Finally, although defendant contests the data obtained from his cell phone, the prosecutor notes that the crucial data evidence was obtained directly from the cell phone carrier, and not removed from the physical phone.

Although a motion to suppress was not filed in the lower court and an analysis of potential exceptions to the warrant requirement could not be addressed because of a cursory record pertaining to the retrieval of defendant's items, we conclude that the admission of this evidence was harmless error. The articles of clothing and the physical cell phone itself were not the pivotal evidence that secured defendant's convictions. Rather, the identification by Williams as the shooter, the testimony that the victim fired his weapon back at his assailant, the testimony by eyewitnesses that defendant was injured as he fled the barbershop and bled from his side, defendant's presence at his employer's home shortly after the shooting and the home's proximity to the barbershop (regardless of any cell phone data), the vehicle and defendant's arrival at the hospital that preserved on video his clothing, and defendant's need for medical treatment for a gunshot wound were the key pieces of evidence that resulted in defendant's convictions. In light of the opinion that the admission of the clothing and the cell phone were harmless error, defendant cannot show plain error affecting his substantial rights. Accordingly, this issue does not entitle defendant to appellate relief.

## V. COURT ORDERED CELL PHONE RECORDS

Defendant submits that the cell phone records should have been suppressed because they were obtained pursuant to a court order instead of a search warrant. We disagree.

A trial court's factual findings following a suppression hearing are reviewed for clear error. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). However, if the trial court's ruling presents a question of law or the application of a constitutional standard to undisputed facts, appellate review is de novo. *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014).

During trial, defendant moved to suppress the phone records, citing *Carpenter v United States*, ___ US ___, ___; 138 S Ct 2206; 201 L Ed 2d 507 (2018) for the proposition that a search warrant was required to obtain cell tower call detail records, and a petition was no longer adequate authorization for the records. However, defense counsel noted that the cell phone records were obtained a year before the *Carpenter* decision was rendered, and there was a good-faith exception

to the decision. Consequently, defendant brought the motion to "preserve it for the record." In turn, the prosecutor argued that there was no binding precedent holding that the *Carpenter* decision had retroactive application. Further, it was alleged that a good-faith exception applied because the police relied on the law that existed at the time the records were obtained. The trial court held that the petition seeking the records essentially constituted a search warrant because a reasonable suspicion and probable cause had to be established, the court order was an appropriate manner to obtain the information at the time it was sought, the change in the law had not been given retroactive application, and the police acted in good-faith by obtaining the court order. Consequently, the trial court denied the motion to suppress.

Applying the *Carpenter* decision, we affirm the trial court's ruling. In *Carpenter*, police officers arrested four men suspected of robbing stores in Detroit. One of the men, petitioner Carpenter, admitted that the group included lookouts and getaway drivers and had robbed nine different stores. He also provided the cell phone numbers of different accomplices to the crimes. The FBI used the petitioner's cell phone records to identify other phone numbers called in proximity to the robberies. The prosecutors applied for court orders under the Stored Communication Act (SCA), 18 USC 2703(d), to obtain cell phone records for the petitioner and several other suspects. The provision of the SCA allowed the government to compel the disclosure of certain telecommunications records when specific articulable facts were offered to demonstrate reasonable grounds to believe that the records were relevant and material to an ongoing criminal investigation. See 18 USC 2703(d).

After the petitioner was charged with six counts of robbery and firearm offenses, he moved to suppress the cell-phone data provided by his wireless phone carriers, asserting that the failure to obtain a search warrant to seize the phone records violated the Fourth Amendment. The trial court denied the motion, and the Sixth Circuit affirmed. The Supreme Court concluded that the acquisition of the records constituted a search, stating: "[W]e hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI [cell phone data]." It went on to state:

> Having found that the acquisition of Carpenter's CSLI was a search, we also conclude that the Government must generally obtain a warrant supported by probable cause before acquiring such records. Although the "ultimate measure of the constitutionality of a government search is 'reasonableness,' " our cases establish that warrantless searches are typically unreasonable where "a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing." ***Thus, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."***

> The Government acquired the cell-site records pursuant to a court order issued under the Stored Communications Act, which required the Government to show "reasonable grounds" for believing that the records were "relevant and material to an ongoing investigation." That showing falls well short of the probable cause required for a warrant. The Court usually requires "some quantum of individualized suspicion" before a search or seizure may take place. Under the standard in the Stored Communications Act, however, law enforcement need only show that the cell-site evidence might be pertinent to an ongoing investigation-a

"gigantic" departure from the probable cause rule, as the Government explained below. Consequently, an order issued under [18 USC 2703(d)] of the Act is not a permissible mechanism for accessing historical cell-site records. Before compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one – get a warrant. [Citations omitted; emphasis added.]

Thus, regardless of whether the *Carpenter* decision may be applied retroactively or whether the process for obtaining an order under the SCA was akin to the information submitted to obtain a search warrant, the Supreme Court held that in the absence of a search warrant, an exception to the warrant requirement may be examined and applied. *Id*.

"The 'good-faith' exception renders evidence seized pursuant to an invalid search warrant admissible as substantive evidence in criminal proceedings where the police acted in reasonable reliance on a presumptively valid search warrant that was later declared invalid." *People v Hellstrom*, 264 Mich App 187, 193; 690 NW2d 293 (2004). Thus, unless it was established that the magistrate abandoned his neutral and detached role, "suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id*. at 198.

In the present case, there was no allegation that the police submitted false information to obtain the court order under the SCA. Rather, it appeared that it was a matter of police practice to utilize the SCA in lieu of obtaining a warrant. Further, there was no evidence that the police deliberately utilized the SCA because they did not have an objectively reasonable belief in the existence of probable cause. Consequently, the trial court did not err in denying defendant's motion to suppress. Although the police investigation obtained the cell phone records in light of the SCA, the good-faith exception precluded the suppression of evidence because the police acted in reasonable reliance on the court order secured through the SCA. This claim of error does not entitle defendant to appellate relief.

## VI. EFFECTIVE ASSISTANCE

### A. EXPERT TESTIMONY

Defendant first alleges that trial counsel was ineffective for stipulating to allow lay witness Megan Johnston to provide cell phone data testimony because her testimony exceeded the scope of lay testimony, she was not qualified as an expert, and the jury instruction failed to advise the jury regarding the weight to give her "opinion." We disagree.

To preserve a claim of ineffective assistance of counsel, defendant must request a new trial or an evidentiary hearing in the trial court. *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018). Although an evidentiary hearing was conducted addressing defendant's alibi defense, this claim of error was not raised in the trial court or in a motion to this Court. Consequently, this issue is unpreserved.

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews a trial court's factual findings for clear error and its conclusions of

law de novo. *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019). When no *Ginther*[4] hearing is held in the trial court, appellate review is limited to mistakes apparent on the record. *Id*.

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016). To obtain a new trial premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). It is presumed that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996). However, counsel may be found ineffective for the strategy employed when it is not a sound or reasonable strategy. *People v Dalesandro*, 165 Mich App 569, 577-578; 419 NW2d 609 (1988). The burden of establishing the factual predicate for a claim of ineffective assistance is on the defendant. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Megan Johnston, a crime analyst with the Lansing Police Department, testified that she took phone records from a company and used "various programs" to examine communication and tower data. After delineating her two-day course training and basic knowledge, Johnston testified that she used a program to detail call records and their origination location. She delineated defendant's calls in proximity to the shooting in a listing, and she color coded the most frequent contacts. She also created a map of defendant's cell phone calls and identified a tower in proximity to the barbershop. In the time period following the shooting, Johnston identified the sectors on the map of where defendant's phone was connecting to cell phone towers.

On cross-examination, Johnston admitted that her training was a basic level course, and she had not completed advanced month-long training. Additionally, she could only identify that defendant's phone number made various calls, but not that he placed them. She further admitted that the cell phone towers varied in a particular location, and the phone did not necessarily "hit" the closest tower. She also acknowledged that the cell phone "hit" did not reflect whether the phone was a block away or a mile away from the tower.

Under the circumstances, defendant failed to meet the factual predicate for the claim of ineffective assistance of counsel. The decision to stipulate that Johnston was merely a lay as opposed to an expert witness seemingly reflected defense counsel's questioning of Johnston's qualifications. He noted that she merely completed a basic two-day course, and there was more extensive training that she had not completed. Additionally, defense counsel's questioning led to

---

[4] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

-11-

Johnston's admission that cell phones did not necessarily "hit" the closest towers and that the distance between the phone and the towers could be a block or a mile. Thus, regardless of whether Johnston was labeled a lay or expert witness, defense counsel obtained admissions regarding the deficiencies in cell phone analysis. Furthermore, there was evidence that defendant went to his employer's home after he was shot, and the home was within two blocks or walking distance of the barbershop. Thus, the defense did not dispute that defendant was in the area of the barbershop in proximity to the timing of the shooting, but offered the alternative explanation that it was because his employer lived in the area, not to commit the shooting. Whether Johnston was classified as a lay or an expert witness had no bearing on the fact that the evidence demonstrated that defendant was in the area of the barbershop, although he submitted it was for an entirely valid reason. Thus, a clarifying jury instruction regarding the nature of this testimony was unnecessary. This claim of error is simply not a mistake apparent on the record and does not entitle defendant to appellate relief.

## B. RETAIN AN EXPERT, OBJECTION TO EVIDENCE AND FALSE IDENTIFICATION

To preserve a claim of ineffective assistance of counsel, defendant must request a new trial or an evidentiary hearing in the trial court. *Head*, 323 Mich App at 538-539. Although an evidentiary hearing was conducted addressing defendant's alibi defense, these challenges were not raised in the trial court or in a motion to this Court. Consequently, these alleged errors are unpreserved.

In part A of this issue, defendant alleged that trial counsel was ineffective for stipulating to allow Johnston to provide lay testimony on cell phone data and mapping. However, it was undisputed that defendant was in the area of the shooting because he was at his employer's home, a legitimate reason. In this claim, defendant contends that trial counsel was ineffective for failing to retain his own expert in cell phone analysis. However, on appeal, defendant fails to present an affidavit or other documentary evidence from an expert that his opinion would have contradicted Johnston's testimony. More importantly, in light of the testimony that defendant was at his employer's home and it was located within walking distance of the barbershop, it is unclear what benefit defendant's own retained expert would have offered or that he could have countered Johnston's testimony.

Additionally, defendant contends that it was error to fail to object to the seizure of his clothing, his wallet, and his cell phone from the hospital. Indeed, defense counsel did not move to suppress defendant's clothing or his wallet. However, defendant's clothing was captured on the hospital's video recording system when he was dropped off at the hospital. Thus, even if the clothing had been suppressed, the eyewitness testimony regarding what defendant was wearing could have been compared to the video recording preserved by the hospital. Although defendant notes that his wallet was seized at the hospital, he fails to argue any admission or evidentiary citation at trial that should have been excluded. Finally, defense counsel did move for suppression of the cell phone from trial, citing the change in the law premised on the *Carpenter* decision. However, the trial court denied this motion, and we concluded that the cell phone data was properly admitted pursuant to the good-faith exception, regardless of *Carpenter*.

Finally, as concluded in subsection II of this opinion, there was no evidence that the prosecutor knowingly presented false testimony or that Williams committed perjury. Rather, the

shooting occurred directly in front of Williams, and she testified that could identify defendant from his eyes because he fired his weapon directly in front of her. Although Williams may have been mistaken that defendant asked her for a ride to the hospital in light of the testimony from Bigelow and Ward, the jury was entitled to believe all, part, or none of her testimony. Contradictory testimony did not reflect that Williams's testimony was false or that she committed perjury or that the prosecutor knowingly presented false testimony. Thus, defendant failed to meet the burden of demonstrating mistakes apparent on the record. Accordingly, in turn, it cannot be concluded that counsel's performance fell below an objective standard of reasonableness and that, but for the alleged errors, the result of the proceeding would have been different.

## VII. NEW TRIAL

Lastly, defendant alleges that the trial court erred in failing to order a new trial following this Court's remand order for a *Ginther* hearing to address trial counsel's failure to investigate and raise an alibi defense.[5]   We disagree.

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *Armstrong*, 490 Mich at 289. This Court reviews a trial court's factual findings for clear error and its conclusions of law de novo. *Miller*, 326 Mich App at 726.

Peter Watkins authored the letter that asserted defendant was shot when a drug deal between defendant, Watkins, and "Breezy," essentially went "bad." However, trial counsel did not call Watkins as a witness at trial. When appellate counsel called Watkins to the stand at the *Ginther* hearing, Watkins advised the court that, "I'm not about to testify." Indeed, Watkins acknowledged the content of the letter, but declined to confirm its authenticity, repeatedly advising that he could not remember. On cross-examination, Watkins declined to even confirm that he authored the letter and continued to answer any questions with, "I don't know" or "I don't remember." If called to testify at defendant's trial, Watkins would have simply stated that he could not remember whether he was with defendant on the day of the shooting and to any other details. Watkins even failed to remember what he did the day before or after the barbershop shooting.

Defendant's trial counsel, Henry Scharg, testified that, shortly before trial, defendant presented the letter prepared by Watkins claiming that defendant was shot in the park during a drug deal. Scharg did not have the resources for an investigator to interview Watkins because defendant's family had exhausted their finances. However, Scharg now believed that he should have contacted Watkins's lawyer to determine consent for an interview. Yet, Scharg testified that the alibi theory was inconsistent with the theory being pursued, and he urged defendant to abandon the alibi although they continued to discuss the issue between 2 and 5 times, including at trial. Because of the lack of defendant's blood present at the crime scene and the eyewitness testimony that the victim shot his assailant (i.e., Gale), it was best to pursue the theory that defendant was shot elsewhere. Scharg also opined that the alibi provided by Watkins was not supported by the phone records and exploring the phone records was a "waste of my resources." Scharg did not ask

---

[5] *People v Pickens*, unpublished order of the Court of Appeals entered December 13, 2019 (Docket No. 437406).

-13-

defendant where he was shot until shortly before trial, and defendant then provided the alibi defense. However, Scharg believed that he looked for a phone call from Watkins in the phone records.

Defendant and Scharg had "rolling" conversations about the alibi defense, but Scharg deemed it to be a "defense of last resort" because it was not generally successful unless there was independent written evidence to support it. Scharg believed that it was more effective to assert that defendant was shot elsewhere than to claim that he was shot during a drug deal as corroborated by Watkins, an individual defendant met in jail. The late receipt of the alibi letter was also a concern. Although in retrospect Scharg believed that he should have investigated the alibi defense, he opined that it would not have made a difference in the outcome, but simply demonstrated that all possibilities were exhausted.

The trial court denied defendant's motion for a new trial in a written opinion. The trial court found that "the failure to pursue the alibi defense did not deny Defendant a substantial defense because the alibi was completely inconsistent with the overwhelming evidence. Trial counsel elected to pursue a strategy that was, in actuality, consistent with the realities of the case rather than pursue an alibi that risked substantial scrutiny in the eyes of the jury." The trial court concluded:

> Ultimately, the Court sees with convincing clarity that trial counsel could not present a defense that was almost certainly fabricated, or at a minimum, was entirely inconsistent with the evidence and trial counsel's reasoned strategy. There was no specific evidence to support that Defendant was shot in an unrelated incident. Accordingly, trial counsel did what he could and supported the theory with circumstantial evidence. Trial counsel should have conducted a minimum investigation by interviewing Mr. Watkins; however, given trial counsel's extensive experience and his testimony pertaining to his overall strategy, this Court does not believe the omission rises to the level of ineffective assistance of counsel. The jury convicted Defendant because of the overwhelming evidence of his guilt, not because trial counsel was ineffective.

In light of the record and the trial court's factual findings and conclusions of law, we conclude that the trial court did not err in denying the motion for new trial. Although the trial court found that Scharg should have conducted an investigation of the alibi offered by Watkins, the trial court concluded that it did not constitute ineffective assistance in light of Scharg's experience as a defense attorney and his trial strategy.

Scharg acknowledged that he was given the Watkins letter before trial. However, Watkins met defendant in jail when they were housed in the same pod for a lengthy period of time. A close friendship was not reflected in defendant's cell phone history. The letter proffered by Watkins was not notarized or signed. In the letter, he offered to provide additional information and was "willing to talk," but it did not reflect that he would provide sworn testimony. Indeed, when Watkins was called to testify at the *Ginther* hearing, he declined to provide any details or even recall the drug deal and shooting that gave defendant an alibi. He simply stated he could not remember any details, but he recognized what was written on the paper. Further, defendant's parole agent documented an interview that she conducted with Watkins. Watkins asked to act as

an informant, but he was told that the nature of his charge in the federal system would not permit it. He purportedly then recanted his alibi for defendant to his parole agent and further apprised the agent that there was a "hit" on her life.

Because defendant's phone records did not evidence an extensive relationship with Watkins, the relationship with Watkins was initiated through their time in jail, the phone number for "Breezy," was linked to a female located in Flint and not a male drug dealer, and the possible admission of defendant's statement that he was shot at the barbershop as impeachment evidence, it is apparent that Scharg, as trial counsel, did not want to pursue the alibi defense. Scharg testified that he addressed this issue with defendant on multiple occasions, and defendant reluctantly agreed to not pursue it. Indeed, Watkins's testimony at trial demonstrated that he would not have been a favorable witness and abandoned any alibi for defendant when it became apparent that it had adverse consequences to himself. In light of the factual findings, the trial court appropriately denied the motion for new trial, and we cannot conclude that it clearly erred.

Affirmed.

/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly