*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
February 24, 2022

v

No. 354746
Shiawassee Circuit Court
LC No. 1970-003957-FC

DANIEL WHEELER,

        Defendant-Appellant.

Before: CAVANAGH, P.J., and JANSEN and RIORDAN, JJ.

PER CURIAM.

Defendant was convicted by jury trial of first-degree murder, MCL 750.316, in 1971. Defendant was 17 years old at the time of the crime, and sentenced to mandatory life imprisonment without parole. In 2016, the prosecution moved to resentence defendant to life imprisonment without parole under *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016). The trial court held an evidentiary hearing in 2019, and granted the prosecution's motion. Defendant now appeals as of right his August 27, 2020 sentence to life imprisonment without parole. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case were provided in a 1995 unpublished opinion issued by this Court:

This case stems from the 1970 death of then sixteen-year-old Erlinda Paz, who was defendant's former girlfriend. Paz's body was discovered in a wooded lot in February of that year. Lacerations were present on her scalp and forehead. Additionally, a portion of Paz's scalp, approximately the size of a closed hand, was missing from the back of her head. Tests revealed that Paz, who was two and a half months pregnant, had had sexual intercourse within hours prior to her death. There was no evidence to suggest that Paz had been raped. The medical examiner stated that Paz's injuries were consistent with a highway accident. More specifically, the doctor theorized that Paz's scalp could have been loosened by the undercarriage of a traction mechanism or motor vehicle. Alternatively, the medical examiner stated

-1-

that these injuries could have been caused by a gun barrel with a sharp margin. A shotgun barrel was found in the proximity of Paz's body.

Testimony at trial revealed that Paz had written a letter informing defendant that he was the father of the child that she was carrying. Defendant, who acknowledged that he received the letter, was allegedly upset upon learning that the child was his. One witness who was then a friend of defendant's testified that defendant offered him $10 to hit Paz in the stomach prior to her disappearance and death. Another friend of defendant's, John Ostrander, testified that a few days before Paz was reported missing, defendant told him that he was going to kill her. According to Ostrander, defendant later informed him that he had killed Paz with a gun barrel. Ostrander further testified that defendant asked him to help bury the body. After this request was made Ostrander claimed that defendant drove him to the remote location where Paz's body was eventually discovered. The two men were unable to locate Paz's body on this occasion. Finally, Ostrander stated that defendant asked him to provide a false alibi to the police if and when he was ever questioned about Paz's death.

Another friend of defendant's, Rick LaMothe, testified that prior to Paz's disappearance, defendant had taken him to the remote location where her body was eventually discovered. LaMothe claimed to have seen defendant cut the barrel off of a shotgun in January of 1970, approximately one month before Paz's body was discovered. This testimony was corroborated by defendant's mother who testified that defendant had taken a shotgun from the family home and sawed it off. A crime laboratory technician testified that the shotgun barrel found near Paz's body matched the weapon that defendant had sawed off.

Paz's sister, Pearl, testified that she last saw her sister on Friday, January 30, 1970. Pearl stated that the victim informed her before leaving home (between 5:00 or 6:00 p.m.) that defendant was going to pick her up at the corner. Pearl further stated that the victim told her that defendant was "going to show her something" and that he "told her not [to] tell anybody." Defendant's mother testified that defendant left their home by car at approximately 6:00 p.m. on Friday, January 30, 1970. Paz did not return and her family called the police the following day to report her as a missing person.

Janette Bucholz testified that she met defendant between 7:00 and 7:30 p.m. on the same day that Paz disappeared. According to Bucholz, defendant looked "exhausted" when he arrived. Further, Bucholz claimed that defendant had blood stains on his hands and pants. Bucholz said that defendant explained that he had been in a fight with two men. Another woman, Nancy Gerding, heard defendant ask to wash the blood off of his hands. Finally, Gerding said that defendant claimed to have used a pipe to defend himself in the fight with the two men. [*People v Wheeler*, unpublished opinion of the Court of Appeals, issued January 9, 1995 (Docket No. 126769), pp 1-2.]

Defendant was charged with first-degree murder. After a lengthy jury trial in 1971, defendant was found guilty and sentenced to mandatory life imprisonment without parole.

In 1979, this Court remanded the matter for a competency hearing.[1] A psychologist who evaluated defendant, Dr. David R. Wall testified, as well as the doctor who evaluated defendant before his trial, Dr. Gerhardt Stein, and defendant's family members. The trial court determined that defendant was competent to stand trial when he was tried in 1971.

In 1989, this Court remanded the matter for a *Ginther* hearing.[2] The evidentiary hearing was held in 1992, wherein defendant's trial counsel Harlon Mark testified, as well as defendant, his mother, and the trial prosecutor, Gerald Stevens. The trial court determined that there was no ineffective assistance of counsel, defendant appealed this decision, and this Court affirmed. *Wheeler*, unpub op at 1-5.

In 2012, the United States Supreme Court held that a mandatory sentence of life imprisonment without parole when imposed on a juvenile constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. *Miller*, 567 US at 465. In 2016, the Supreme Court imbued *Miller* with retroactive effect. *Montgomery*, 577 US at 208-209.

In July 2016, the prosecutor moved to sentence defendant to life imprisonment without parole under MCL 769.25 and *Miller*, arguing that upon an evidentiary hearing, the facts will show that the *Miller* factors support this sentence. In response, defendant filed several motions. Defendant moved (1) to be sentenced to the minimum term of years because of incomplete records; (2) to deny a sentence as life without parole for a juvenile offender as categorically barred under the United States and Michigan Constitutions; and (3) for the prosecution to bear the burden of proof at the *Miller* hearing and for a presumption of a term-of-years sentence. The trial court denied defendant's motion to categorically bar life imprisonment without parole for a juvenile offender, relying on *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014).[3] The court entered an order denying defendant's motion for a presumption of a term-of-years sentence, relying on *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018), for the proposition that no such presumption exists. The trial court denied defendant's motion to be sentenced to a term of years based on an incomplete record, reasoning that this Court was better suited to determine what records were needed, and the court declined to impose the burden of proof for the *Miller* hearing on the prosecution, relying on *Skinner*.

---

[1] *People v Wheeler*, unpublished order of the Court of Appeals, entered December 16, 1977 (Docket No. 77-4135).

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973); *People v Wheeler*, unpublished order of the Court of Appeals, entered February 5, 1992 (Docket No. 126769).

[3] *Carp* was vacated on other grounds and remanded sub. nom. *Carp v Michigan*, 577 US 1186; 136 S Ct 1355; 194 L Ed 2d 339 (2016), and sub. nom. *Davis v Michigan*, 577 US 1186; 136 S Ct 1356; 194 L Ed 2d 339 (2016).

The *Miller* hearing was held in December 2019. Dr. Daniel Keating testified regarding the general science behind brain development, forensic psychologist Dr. Carol E. Holden testified regarding her evaluation of defendant, and Richard Stapleton testified about defendant's prison record. In an opinion and order addressing the *Miller* factors, the trial court noted that it was a difficult decision, but granted the prosecution's motion to sentence defendant to life imprisonment without parole. Defendant was sentenced as such, with the court finding life imprisonment reasonable and proportionate. Defendant now appeals.

## II. INCOMPLETE RECORD

Defendant first argues that he was denied his due-process rights because the trial court sentenced him to life imprisonment without parole despite several missing pieces of the lower court record that allegedly would have provided evidence on the *Miller* factors. We disagree.

This preserved constitutional issue is reviewed de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018).

Defendant argues that the following records were unobtainable: transcripts of the preliminary examination, transcripts of the jury verdict, a complete transcript of the 1992 evidentiary hearing, the prosecutor's original file, police reports, the circuit court clerk's original file, and defense counsel Mark's case file. Despite defendant's assertion, the transcripts for the preliminary examination from 1970 were included with the lower court record for this Court's review. We reviewed the transcripts, and a majority of the same witnesses who testified at trial also testified at the preliminary examination. Additionally, the entire transcript of the December 11, 1992 evidentiary hearing was included with the lower court record. There is no indication from the one-day transcript that the proceedings lasted more than one day, and the *Ginther* hearing ended with the court taking the matter under advisement. Thus, defendant's arguments regarding the preliminary examination and *Ginther* hearing transcripts are moot. *People v Gonzalez*, 256 Mich App 212, 235 n 8; 663 NW2d 499 (2003) ("An issue is moot where a subsequent event renders it impossible for this Court to fashion a remedy.").

Under the Michigan and United States Constitutions, a person cannot be deprived of life, liberty, or property without due process of law. Const 1963, art 1, § 17; US Const, Am V and Am XIV, § 1. "In the context of criminal proceedings, the denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." *People v Joly*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354379); slip op at 5 (quotation marks and citation omitted). "This is a relatively high bar—only if the absence of that fairness fatally infected the judicial process will there be a violation of due process." *Id*. (quotation marks and citation omitted). Courts look to the totality of the circumstances in analyzing a due-process issue. *Id*. The remedy for a due-process violation depends on the nature and context of the violation. *Id*. at 6.

The fact that the remaining missing records were not available for the defendant to use during the *Miller* hearing does not constitute a violation of due process. A transcript of the rendering of the jury's verdict at defendant's trial is, in fact, missing from the lower court record. The last day of the available trial transcripts ends with the jury being released for deliberation. However, the parties do not dispute that the jury found defendant guilty of first-degree murder.

The remaining six volumes of over 1200 pages of the jury trial were available for review. Defendant does not even state how the jury's verdict would provide any evidence relating to any of the *Miller* factors. Thus, a violation of defendant's due-process rights did not occur.

The remaining documents defendant asserts were needed are the prosecutor's original file, police reports, the circuit court clerk's original file, and defense counsel Mark's case file. Defendant notes in his brief on appeal that defense counsel appointed for the *Miller* hearing argued that Mark's case file was "likely the best mitigating evidence" of defendant's behavior and limitations around the time of the crime and trial, and that the prosecutor's file "likely also contained mitigating evidence" given prosecutor Stevens's concerns with defendant's trial in hindsight. This is mere speculation. And defendant offers no reasoning why the clerk's file or police reports would be relevant to the *Miller* factors.

Defendant relies on *People v Adkins*, 436 Mich 878, 878; 461 NW2d 366 (1990), wherein the Michigan Supreme Court, in lieu of granting leave to appeal, remanded to the trial court for further proceedings, stating:

> The transcript of the hearing at which the defendant's guilty pleas were accepted is not able to be produced because the notes of the stenographer have been lost. The defendant has done nothing here to compromise his position by his own misconduct, and the record is inadequate for meaningful appellate review and so impedes the enjoyment of the defendant's constitutional right to an appeal that the defendant's convictions must be vacated and this case remanded for further proceedings. [Citations omitted.]

Here, the trial court relied on the *Adkins* language "inadequate for meaningful *appellate* review" to deny defendant's motion for a term-of-years sentence based on an incomplete record. This case is distinguishable from *Adkins* because the record provided to this Court was plenty sufficient for appellate review. It contained six lower court files, three from defendant's original proceedings and three from defendant's current proceedings, as well as the preliminary examination, trial, competency hearing, *Ginther* hearing, and *Miller* hearing transcripts, as well as other proceedings. The record filled two entire banker's boxes. An incomplete record can jeopardize a defendant's right to appeal; "[h]owever, not every gap in a record on appeal requires reversal of a conviction." *People v Wilson (On Rehearing)*, 96 Mich App 792, 797; 293 NW2d 710 (1980).[4] "When the surviving record is sufficient to allow evaluation of the appeal, the defendant's right is satisfied." *Id*. Here, the record was sufficient. Thus, defendant's due-process rights were not violated from the missing portions of the record, and the trial court did not err in denying his motion for a term-of-years sentence on this basis.

---

[4] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority[.]" *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

### III. *MILLER* FACTORS

Next, defendant argues that the trial court abused its discretion when it imposed a sentence of life imprisonment without parole because the *Miller* factors mitigated against imposing such a sentence, and defendant should have been sentenced to a term of years. We disagree.

A trial court's sentencing decision is reviewed for an abuse of discretion. *Skinner*, 502 Mich at 131. The court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "The trial court's fact-finding at sentencing is reviewed for clear error." *People v Lampe*, 327 Mich App 104, 125-126; 933 NW2d 314 (2019). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (citation and quotation marks omitted). Issues of law are reviewed de novo. *People v Al-Shara*, 311 Mich App 560, 567; 876 NW2d 826 (2015).

Defendant was sentenced to life imprisonment without parole in 1971 under a then-mandatory statutory scheme. In 2012, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 US at 465. Following *Miller*, the Michigan Legislature enacted MCL 769.25 and MCL 769.25a, addressing sentences of life imprisonment without parole for juveniles and the option for a term-of-years sentence. In 2016, the United States Supreme Court determined that its holding in *Miller* constituted a substantive rule of constitutional law that applied retroactively. *Montgomery*, 577 US at 208-209. Thus, in 2016, the prosecution moved to resentence defendant to life imprisonment without parole, and defendant argued in favor of a term-of-years sentence. The trial court held a *Miller* hearing in 2019, and resentenced defendant to life imprisonment without parole. Defendant argues that this was an abuse of discretion.

The *Miller* Court recognized that the attributes of youth diminished the penological justifications for imposing life imprisonment without parole on juvenile offenders. *Miller*, 567 US at 472. The Michigan Supreme Court set forth the factors the court must consider in deciding whether to reimpose a sentence of life imprisonment without parole:

> The following are the factors listed in *Miller*: (1) "his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether "he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." [*Skinner*, 502 Mich at 114-115, quoting *Miller*, 567 US at 477-478.]

The *Miller* factors mitigate the proportionality of a sentence of life imprisonment without parole for a juvenile offender. *Miller*, 567 US at 489. This is because there is a difference between the crime of a juvenile offender that demonstrated the juvenile's transient immaturity and the crime of the "rare juvenile offender whose crime reflects irreparable corruption." *Id*. at 479-480. Under *Miller*, trial courts are required to consider how children are different and how those differences weigh against irrevocably sentencing them to life imprisonment without parole. *Id*. at 480.

## A. CHRONOLOGICAL AGE AND ITS HALLMARK FEATURES

In analyzing the first *Miller* factor, the court noted that defendant was four months shy of his eighteenth birthday at the time the crime occurred. This, according to the court, gave defendant the benefit of additional years of maturation compared to other juvenile offenders, which "somewhat lessens the mitigating impact of his age, but does not eliminate it." Defendant argues on appeal that the trial court erred in considering defendant's proximity in age to 18 years as an aggravating factor. This argument lacks merit. The court noted the scientific research regarding brain development that was presented at the hearing. Because defendant was close to the age of majority, this tends to militate toward his ability to appreciate and understand the consequences of committing this crime. However, the trial court clearly stated that defendant's age "*lessens* the mitigating impact of his age," but did not eliminate it. This was not clearly erroneous.

Defendant dropped out of school at age 15, started running with a bad crowd, and started abusing drugs. He was considered emotionally overreactive and impulsive at the time of the crime. Defendant, however, could not remember committing the crime, and had few memories of the years surrounding the murder. Thus, Dr. Holden could not infer defendant's thinking at the time of the crime. Based on the circumstances surrounding the crime, the trial court concluded that it did not implicate the hallmarks of youth. Paz went missing only days after informing defendant in the letter that she was pregnant. Defendant had asked his friend, Richard Croslin, to hit Paz in the stomach. Defendant admitted to Ostrander that he killed Paz, and asked Ostrander for help burying the body. Defendant also asked Ostrander to provide a false alibi to the police. He had sawed off the barrel of the shotgun before Paz went missing. The trial court concluded that although defendant was impetuous and immature at the time of the crime, and substance abuse impaired his decision-making, these characteristics did not play an appreciable role in the crime, which clearly displayed evidence of foresight and planning. This was not clearly erroneous.

## B. FAMILY AND HOME ENVIRONMENT

The trial court had difficulty assessing defendant's family and home environment because a different version was presented for the first time at the *Miller* hearing than what had been presented throughout the case, and the court found defendant's lack of memory "convenient." The court did not make a clear conclusion related to whether this factor mitigated against life imprisonment without parole, but noted that it could not be sure that defendant's home life was in fact brutal. Given the differing evidence presented, this was not clearly erroneous.

There was little evidence presented at defendant's 1971 jury trial regarding his home and family life. His mother, Evelyn Wheeler, testified that she had trouble disciplining defendant as a child, he dropped out of school in the ninth grade, and told a lot of lies. If defendant got upset, he would run into the woods and cry. He did not get along well with other kids, and was teased.

However, when Evelyn learned that Paz was pregnant, she told defendant that the family would support the child even if defendant did not want to marry Paz.

Defendant's competency hearing took place in 1979. He was evaluated by Dr. Wall beforehand, and defendant reported to Dr. Wall that his family relationship was "not too bad." There was no mention of abuse by family members. At the competency hearing, his family members mostly testified about defendant's behavior after he dropped out of school, and close in time to the murder. After hearing the family member's testimony, Dr. Wall opined, "I would wonder about the social history sometimes because he describes his family history as being quite good, but with the amount of underlying rebelliousness and hate of authority figures I don't know as it was all that good." Dr. Stein, who evaluated defendant before trial and determined he was competent to stand trial back then, testified at the competency hearing that defendant's social history provided at the competency hearing did not contribute to or change his opinion.

In 2019, when defendant filed his witness list for the *Miller* hearing, he attached an affidavit from his brother, Timothy Wheeler. Timothy was the youngest of the seven siblings, and only four and a half years old at the time of the crime. He attested that their mother was a good, caring, and special person, who cooked fresh meals, darned clothing, and did laundry. There was no mention of abuse.

It was not until October 2019, in defendant's resentencing memorandum, that defendant asserted that throughout childhood he was subject to physical abuse from his father, sexual abuse, and poverty. He asserted that although he got along with his mother, his father had "unexplained rage," and would beat defendant and his brother, Ernie Wheeler. Defendant also asserted that he was sexually molested by Ernie when defendant was 11 or 12 years old, defendant reported it to his mother, and Evelyn ignored it.

At the *Miller* hearing, Dr. Holden testified that defendant reported inconsistently living at home because of his father's abuse. Defendant reported to Dr. Holden that his father became inexplicably rageful and physically abusive toward defendant and one brother, resulting in welts and blood. One time another older brother stepped in because he thought defendant would be killed. These beatings occurred until defendant was 15 years old. Dr. Holden testified that the physical and sexual abuse defendant experienced constitutes trauma, which would impact his development.

It was not clearly erroneous for the court to conclude that the evidence presented two very different versions of defendant's home and family life when analyzing the second *Miller* factor. The court could not corroborate defendant's new version of the facts because his brother was very young when the crime occurred, and now both of defendant's parents were deceased. The court did not make a clear conclusion whether it considered this factor as mitigating. Given the conflicting evidence, this was not clearly erroneous and not an abuse of discretion in the trial court's ultimate determination to sentence defendant to life without parole.

## C. CIRCUMSTANCES OF THE OFFENSE

Regarding the circumstances of the offense, the court relied on its discussion of premeditation contained under the first factor, and found this factor to be the most compelling.

The court also found that there was no familial pressure to commit the crime because Evelyn said she would support the child regardless of whether defendant stayed in a relationship with Paz. There was no peer pressure because defendant acted alone. This was not clearly erroneous.

In evaluating this factor, this Court has recognized that

[n]early every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without-parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court. [*People v Bennett*, 335 Mich App 409, 426; 966 NW2d 768 (2021) (quotation marks and citation omitted).]

The trial court recognized that all juvenile lifers have committed heinous crimes, but found defendant's crime particularly heinous. Defendant was found guilty of murdering his pregnant, teenage girlfriend. *Wheeler*, unpub op at 1. Paz's body was found in a remote woodlot that defendant was familiar with, and took his friends to. *Id*. at 1-2. The doctor who performed Paz's autopsy testified that she had "enormous" head injuries, including lacerations of the scalp and a piece missing from her scalp the size of a hand. Her face and neck were black and blue with abrasions. She had injuries to her chest and rib fractures. Defendant had recently sawed off the barrel of a shotgun before Paz went missing, and a shotgun barrel was found near Paz's body at the woodlot. *Wheeler*, unpub op at 1-2. The autopsy doctor testified that indentation marks between her breasts could have been made by a gun barrel. Defendant reported to Dr. Holden before the *Miller* hearing that he did not commit the crime, and he could not remember the crime, but he could not say that he did not commit it.

The trial court did not solely rely on the circumstances of the crime to resentence defendant to life imprisonment without parole. It considered this factor in its analysis with the other factors, and its findings were not clearly erroneous. There was no abuse of discretion in relation to this factor.

D. ABILITY TO INTERACT WITH THE CRIMINAL JUSTICE SYSTEM

The fourth *Miller* factor requires the court to consider whether the defendant "might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys[.]" *Skinner*, 502 Mich at 115 (quotation marks and citation omitted). The trial court concluded that defendant's age influenced the decisions he made related to his trial. This included refusing to work with his trial attorney, and giving false stories to investigators and his attorney. This was not clearly erroneous.

Before defendant's jury trial, on June 10, 1970, defendant's trial counsel Mark filed a petition for diagnostic commitment after defendant head-butted a wall in prison, and had to be restrained by a straitjacket. The petition states that Mark had "noticed a steady decline in the Defendant's ability to understand and comprehend his own condition in reference to the proceedings and in his ability to assist your petitioner to prepare his defense in a rational and reasonable manner." The court granted the petition, and defendant was committed to the Forensic Center for a psychological evaluation. Defendant was committed to the Forensic Center a second time in March 1971, shortly before trial, for a competency evaluation. It was made clear at the competency hearing held after defendant's trial, in 1979, that Dr. Stein evaluated defendant at the Forensic Center both times before trial, and determined that he was competent. This led defense counsel Mark to abandon a defense of insanity at trial. When defendant's competency was addressed in 1979, the court concluded that he had been competent to stand trial in 1971.

In 1992, this Court remanded the matter to the trial court for a *Ginther* hearing.[5] Trial counsel Mark testified that he presented to defendant a plea deal to second-degree murder in exchange for a term-of-years sentence, but defendant declined it at the advice of his father. Mark testified that defendant's father was outspoken in his belief that defendant was innocent, so he would not be convicted. Defendant's mother, Evelyn, and defendant both testified that a plea deal was never discussed with them. However, defendant did not remember the trial so he said that it was possible that a plea bargain was offered but he did not remember it. The trial court determined in its opinion and order that Mark did solicit a plea deal from the prosecution, which was conveyed to defendant, but defendant rejected it based on his and his family's assertion that he was innocent.

At the *Miller* hearing in 2019, Dr. Holden testified that she confirmed that defendant was offered a plea deal, but he turned it down at the advice of his family. But defendant could not recall the reasoning why. Dr. Holden testified that the record indicated defendant was passive in his defense, which was in line with his immaturity and unsophistication. The trial court concluded that because defendant lacked memory of the crime and the years surrounding the trial, it could not determine whether he declined the plea offer of his own volition or under pressure of his family. However, the court concluded that it was consistent with *Miller* to presume that defendant's age influenced his decision-making. Thus, the trial court properly concluded that this was a mitigating factor.

## E. POSSIBILITY OF REHABILITATION

"A judge resentencing an offender who has served many years in prison has the benefit of actual data regarding whether the offender's life in prison is truly consistent with 'irreparable corruption[.]' " *Bennett*, 335 Mich App at 420. "In the usual sense, 'rehabilitation' involves the successful completion of vocational, educational, or counseling programs designed to enable a prisoner to lead a useful life, free from crime, when released." *Id*. at 426.

---

[5] *People v Wheeler*, unpublished order of the Court of Appeals, entered February 5, 1992 (Docket No. 126769).

-10-

The trial court deemed defendant's prison record "quite impressive." The severity and frequency of his prison misconducts dwindled with age and over time, and he stayed in level II security since 1990. He received an assaultive misconduct in 2005, which the court contextualized in light of his mental health episode that occurred at the same time. Ultimately, however, the court concluded that defendant was more safely managed within the structured environment of the prison given his recent prison record. This included a 2018 possession of contraband misconduct, the timing of which concerned the court because it occurred after the resentencing proceedings were underway. At the resentencing hearing on August 27, 2020, the court noted a June 5, 2020 possession of stolen property misconduct.

This factor is a close determination. Dr. Holden testified that defendant had a "rocky start" to imprisonment, which was normal for a juvenile offender. Defendant manufactured a gun and firecracker, abused substances, and was put in segregation. This made defendant change his ways, and his disciplinary record was exemplary for the next 40 years. He remained in low level security since 1990. He obtained a general education diploma (GED) and completed several occupational training programs. He held several skilled and semiskilled jobs, with consistently excellent evaluations from his supervisors. He completed programming that was available to him. Defendant had one psychotic episode in 2005, for which he received treatment and had no episodes since. He received a misconduct related to this breakdown in 2005 because he spit on another inmate. In 2015 and 2018, he received misconducts for possession of contraband, but his security level did not change. Stapleton considered defendant very low risk and an excellent candidate for parole.

Although this factor presents a close determination, this writer submits that the trial court did not clearly err in its findings of fact. *Miller* only commands that a sentencing court follow a certain process, not that it accepts a defendant's presentation. *Miller*, 567 US at 479-480. It was not out of the range of reasonable and principled outcomes for the court to determine that defendant was not rehabilitated given his very recent prison misconducts.

Overall, the trial court properly considered the *Miller* factors and applied the law to the facts of the case before imposing the sentence of life imprisonment without parole. This was within the range of principled outcomes. Thus, the trial court did not abuse its discretion in resentencing defendant to life imprisonment without parole.

IV. CATEGORICAL BAN

Defendant also argues on appeal that his sentence of life without parole imposed for a crime committed before he was 18 years old is categorically barred as cruel and unusual punishment under the Eighth Amendment and the Michigan Constitution. We disagree.

As stated above, preserved constitutional issues are reviewed de novo by this Court. *Wiley*, 324 Mich App at 150.

This issue was squarely addressed in *Carp*, 496 Mich at 451. There, the Michigan Supreme Court determined that the Eighth Amendment of the United States Constitution does not categorically bar the sentence of life without parole for a juvenile offender, *id*. at 518, nor does the broader ban against "cruel *or* unusual" punishment contained in the Michigan Constitution, *id*.

at 518-521. Although defendant points to changing trends among other states now prohibiting life imprisonment without parole for *any* juvenile offender, this Court "is bound to follow decisions by [the Supreme] Court except where those decisions have clearly been overruled or superseded and is not authorized to anticipatorily ignore [Supreme Court] decisions where it determines that the foundations of a Supreme Court decision have been undermined." *People v Anthony*, 327 Mich app 24, 44; 932 NW2d 202 (2019) (quotation marks and citation omitted). Although *Carp* was overruled in part regarding its conclusion that *Miller* did not apply retroactively, because *Carp* was decided before *Montgomery*, 577 US at 208-209, which held that *Miller* did apply retroactively, the main holding of *Carp* has not been overruled or superseded. Therefore, we are bound by the decision in *Carp* because it remains good law. As such, defendant's sentence for life imprisonment without parole for a crime committed before he turned 18 years of age is not categorically barred by the United States or Michigan Constitutions, and the trial court properly denied defendant's motion requesting a term-of-years sentence on this basis.

## V. BURDEN OF PROOF

Lastly, defendant argues that the prosecution should bear the burden of proof at the *Miller* hearing that defendant was irreparably corrupt. Defendant argues that traditionally the moving party bears the burden of proof, other jurisdictions that have reached this issue have concluded that the prosecution bears the burden, and this rule is better grounded in constitutional and policy concerns as well as the specific circumstances of a *Miller* hearing. We disagree.

This Court reviews de novo, as a question of law, the proper allocation of the burden of proof. *People v Robar*, 321 Mich App 106, 134; 910 NW2d 328 (2017).

This issue is currently scheduled for oral argument before the Michigan Supreme Court. See *People v Taylor*, 964 NW2d 38, 38 (2021) ("the parties shall address: (1) which party, if any, bears the burden of proof showing that a *Miller* factor does or does not suggest a [life without parole] sentence"). Until that is decided, the Court must rely on current caselaw, and there is nothing in *Miller*, Michigan statutory law, or Michigan caselaw that places the burden, or even suggests that a burden exists, on the prosecution to prove that a juvenile is irreparably corrupt beyond a reasonable doubt. See *Miller*, 567 US at 489; MCL 769.25; MCL 769.25a; *Bennett*, 335 Mich App at 413-415. Rather, the United States Supreme Court recently provided that a court sentencing a juvenile offender who is convicted of murder is not required by the constitution to find that the defendant is permanently incorrigible before sentencing the defendant to life without parole. *Jones v Mississippi*, ___ US ___; 141 S Ct 1307; 209 L Ed 2d 390 (2021); slip op at 7-19. Although it is the "rare" juvenile who is "irreparably corrupt" such that life imprisonment without parole is appropriate, neither *Miller* nor *Montgomery* "require trial courts to make a finding of fact regarding a child's incorrigibility" nor the juvenile's irreparable corruption. *Skinner*, 502 Mich at 106, 122-123; *Jones*, ___ US ___; slip op at 14. Because there is no requirement for the trial court to make a finding on whether the juvenile offender is irreparably corrupt, it follows that the prosecution does not bear the burden of proving that the defendant is irreparably corrupt beyond a reasonable doubt at the *Miller* hearing.

Moreover, the Michigan Supreme Court explicitly provided that there is no presumption against life imprisonment without parole. *Skinner*, 502 Mich at 131. The *Skinner* Court stated, "there is language in *Montgomery* that suggests that the juvenile offender bears the burden of

-12-

showing that life without parole is not the appropriate sentence by introducing mitigating evidence." *Id*. at 131. Thus, in light of current caselaw, the intent of our Legislature is evidenced in the plain language of MCL 769.25 and MCL 769.25a, which provides no suggestion of a burden of proof. Therefore, the trial court did not err in denying defendant's motion to place the burden of proof on the prosecution.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Michael J. Riordan